[No. A012679. First Dist., Div. Three. Aug. 23, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
PETER K. GOPAL, Defendant and Appellant.

**COUNSEL**

John W. Clark, Michael J. Korda and Clark & Korda for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Thomas A. Brady and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ANDERSON, J.*—**Appellant Peter K. Gopal, together with Lee Yamada, Jim Catanich, and Andrew Moore,[1] was indicted in 1978[2] on a total of 23 counts relating to events surrounding the alleged theft of trade secrets from Silicon Valley firms manufacturing semiconductors and computer chip devices. In essence, the investigation involved a "sting" operation in which appellant offered to sell and then delivered stolen property to corporate security officers resulting in his arrest, the issuance of a search warrant, and the seizure of additional stolen property.

After lengthy pretrial proceedings and a 31-day court trial,[3] appellant was found guilty of conspiracy to commit a crime (Pen. Code, §§ 182/496),[4]

---

*Assigned by the Chairperson of the Judicial Council.

[1]The proceedings against the other three defendants were severed from the case against appellant. Charges against Yamada were eventually dismissed. Moore pled guilty to one count of solicitation to commit a felony (count 23) and was placed on probation. Catanich pled no contest to one count of possessing stolen property (count 10) and was also placed on probation. Catanich's appeal is pending. (See *People* v. *Catanich* (Aug. 23, 1985) A021711.)

[2]The postindictment preliminary hearing requirement of *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586 P.2d 916], was held inapplicable to this case. (*Gopal* v. *Superior Court* (1978) 1 Civ. 45577, petn. den. Dec. 5, 1978.)

[3]The clerk's transcript exceeds 1,000 pages; the reporter's transcript has more than 2,000. Opposing counsel concur that the case is " 'immensely complex, involving alleged theft of trade secrets over a three year period.' " The record includes testimony and other evidence pertaining to scientific and technical matters, as well as about the history and economics of the semiconductor industry. For a general discussion of the problems of protecting property interests in this area, see 1984 United States Code Congressional and Administrative News, pages 5750-5753.

[4]Unless otherwise indicated, all section citations are to the Penal Code.

offering a bribe to acquire a trade secret (§ 499c, subd. (c)), and four counts of possession of stolen property (§ 496).[5] He was sentenced to two years and eight months in state prison.

## I. FACTS

### A. *Introduction*

To understand the nature of the stolen property,[6] an elementary description of the manufacturing process of semiconductors may be helpful. At an earlier state of these proceedings, Division One of this court concisely summarized this process as follows:

"The first step involved in the process is creating a 'composite drawing,' i.e., a handrawn depiction of all layers of the product, resembling a schematic for a radio. This design is then 'digitized': a computer traces every line along an X-Y cursor, and stores the information. This is called a *data base tape.*

"[The manufacturer] then sends the pattern generator tape to a mask vendor, who puts it into a machine which, by use of a camera develops a *reticle.* The reticle is 10 times larger than the actual chip size and contains the information for just one of the 6 to 10 layers which comprise a chip.

"Next, the reticle is blown up 200 times—the resulting enlarged reproduction being called a '*blow back*' or '*overlay.*' Once the reticle is confirmed as containing the correct design, it is placed in a repeat camera which reduces the design to actual size and repeats it over and over again on a chrome piece or 'mask' which then becomes the actual production tool." (*People* v. *Superior Court (Moore)* (1980) 104 Cal.App.3d 1001, 1005 [163 Cal.Rptr. 906], italics added; see also 1984 U.S. Code Cong. & Admin. News, at pp. 5760-5763.)

---

[5]Specifically, appellant was convicted of conspiring with Andrew Moore and others to sell products and information belonging to Intel Corporation (Intel) (count 21); offering a bribe on September 19, 1978, to Larry Worth, a National Semiconductor Corporation (NSC) employee, to acquire an article representing a trade secret of NSC (count 18); illegally possessing, during the period between November 8, 1975 and September 27, 1978, "reticles, overlays and blow-backs pertaining to Intel Corporation Product 2114" (count 2), "reticles, overlays and blow-backs pertaining to Zilog Corporation Products" (count 6), and "data base tapes" belonging to NSC (count 8). Further, he was convicted of illegally possessing, on September 22, 1978, "data base tapes pertaining to National Semiconductor Products" (count 10).

[6]See footnote 5, *ante.*

B. *The Prosecution Case*[7]

On September 11, 1978, Larry Worth, the purchasing manager for National Semiconductor Corporation's (NSC's) computer operations group, participated in a sales meeting with a Japanese semiconductor manufacturer. The meeting was also attended by Andrew Moore. During the meeting, Moore asked Worth to step aside, and inquired whether Worth might be interested in buying certain fast memory chips being produced by Intel Corporation (Intel), together with the process for manufacturing them.

At the time, NSC was working on a memory board to upgrade certain IBM systems and they were interested in Intel's 2147 device, a very fast state-of-the-art chip. Worth told Moore that for NSC to be interested, "they would have to be Intel . . . ." Moore confirmed that they were. He indicated that the person who had them (who later turned out to be appellant) was then in Europe selling them to foreign semiconductor corporations, but he was expected back in a week. When asked the price, Moore said it would be $200,000 per processor, or $1 million to $2 million on a group deal. Worth told Moore he would "take it to Charlie"—Charles Sporke, president of NSC.

Worth advised Sporke of the offer and then telephoned Moore to tell him that NSC was interested "as long as they were Intel parts . . . ." Moore again reassured Worth and said he would let Worth know "when the fellow that had them was back in town . . . ."

Meanwhile, Sporke contacted officials at Intel. At his request, Worth met with security agents from both NSC and Intel and the two companies decided to pursue a joint investigation. Intel representatives contacted the Santa Clara Police Department for assistance and officers from the detective division were assigned to the case.

On September 19, 1978, Moore telephoned Worth to tell him his principal was back from Europe. Moore arranged for Worth to meet with them later that day at 1030-H East Duane Avenue in Sunnyvale, the offices of appellant's business, Semiconductor Systems, Inc. (SSI). Before going, Worth was equipped by police officers with a hidden transmitter so his conversations could be monitored and recorded by the Santa Clara police.

That afternoon, Worth met with Moore and appellant Gopal at the East Duane Avenue offices. They discussed various memory chips from Intel,

---

[7]This portion of the factual summary parallels the chronology of overt acts set forth in count 21.

including the 2114 and 2147 devices. During their conversation, Gopal characterized the chips as being proprietary information of Intel.[8] Using a blackboard, Gopal noted the various model numbers, their availability, the prices per mask and per process, and offered to sell them to Worth. He indicated a copy of Intel's 2147 could not be ready until December, so the discussion focused on the 2114. Prices of $150,000 for the data base tape from which to produce the 2114 and $250,000 for the process were mentioned. Similar prices were mentioned for the Intel 8080 and other Intel products they discussed. Gopal suggested that payments be made by check to a Hong Kong company, and that any invoices referring to the transaction be for "design and consulting." After further discussion of the financing, Gopal again reassured Worth that by buying his materials, "you'll get the same parts as Intel . . . ."

Changing the subject, Gopal then asked Worth if Worth was interested in selling any of NSC's circuits—specifically, a Calma data base tape for National's 8251.[9] According to Worth, Gopal "offered me $10,000 for me to get these tapes any way I could get them. . . . [¶] I would have had to steal them." Gopal offered to pay Worth in cash. "All I want is the tape." When Worth expressed concern about the legal ramifications, Gopal said he would not use the tape to produce a chip in this country, nor would it be sold in the competitive world market. "Most of my clients are using it for in-house process."

The next meeting was on September 25 at a Chinese restaurant in San Jose. Gopal, Moore and Worth were joined by Thomas Dunlap, an Intel employee acting as if he were employed by NSC. For purposes of the investigation, NSC had provided him with an office, phone, and identification badge. In fact, Dunlap was an electrical engineer and lawyer responsible for administering technology exchange at Intel and he was aware of all Intel technology officially leaving that company. His goal was to determine technically whether appellant actually had access to Intel's proprietary products and information.

During this restaurant meeting (which was also monitored and recorded), appellant repeated his earlier offer to Worth to sell the 2114 design and

---

[8]Based on his testimony at trial, it appears that appellant correctly understood that, as used in the industry, "proprietary information" meant information over which the owner sought to maintain secrecy and which was not generally available to the public. "If I have a document that belongs to SSI and I give it to a customer and I specifically tell the customer, 'Do not give this to anyone else,' then I would see that document as being proprietary." Interestingly, appellant considered his own designs based on Intel's 2114 device to be proprietary. And Intel's general counsel, Roger Barovoy, considered the circuit design of Intel's 2114 to be secret, even after the product was placed on the market.

[9]This portion of the conversation provided the basis for count 18 (bribery to acquire a trade secret, § 499c, subd. (c)). A recording of the entire transaction was in evidence.

process information for a total of $250,000 and said it would be available the next day. Gopal arranged to meet Dunlap the next day at NSC, and said he would bring a data base tape, some SSI overlays, and an actual Intel overlay and reticle, so Dunlap could compare the SSI materials with the Intel originals. Dunlap was to be ready to pay $100,000.

Later on that same afternoon of September 25, Moore came to Worth's office at NSC. Moore volunteered that Worth would receive 7 percent of all sales between appellant and NSC. Thus, Worth would receive $7,000 of the $100,000 sale price that had been set for the sale of the Intel 2114 product information.

The September 26 meeting between Gopal, Moore, and Dunlap at NSC "went off but it did not go off exactly as planned." Dunlap called Moore to tell him that "the money could not be laundered in time." Meanwhile, Gopal had decided not to bring a data base tape as he feared that NSC might copy it during the course of the testing procedures. He did bring a set of SS0012A overlays (SSI's version of the 2114) and an Intel reticle. During their discussions, appellant indicated that it was the 2114*E,* the latest version of the Intel 2114, which he had copied. Dunlap was unaware of any other company having copied the 2114E version. At one point during their meeting at NSC, Dunlap noticed Gopal taking a piece of masking tape to cover up the word "Intel" on one of the overlays he had brought. From NSC, the three adjourned to a nearby coffeeshop, where they again reviewed the transaction; Gopal reassured Dunlap as to the genuineness of the Intel information being sold, and a final meeting was set for the next day.

Later on September 26, Moore telephoned Worth to let him know that "the deal was on, that Tom [Dunlap] had been happy with what he had seen and they made a deal." That was the last conversation between the two.

On September 27, Dunlap went to appellant's condominium to meet with Moore and Gopal. The final agreement had been that Dunlap would bring $100,000 in traveler's checks and Gopal would bring a data base tape, a composite plot and a picture. Dunlap actually brought $25,000 for the data base tape, and explained he wanted to bring the tape back to NSC to verify its contents, after which he said he would return with the additional $75,000. As Dunlap gave the $25,000 to Moore, Gopal gave Dunlap the data base tape and Dunlap said, "we had a deal." This latter comment was the cue for the police, who had been monitoring the conversations from outside, to make their arrests. As Dunlap opened the door to leave for NSC, the officers came in. When arrested, Gopal was carrying a briefcase containing the data base tape for the SS0012.

Warrants were obtained to search appellant's condominium as well as his business premises on East Duane Avenue. During these searches, a huge quantity of reticles, overlays, blowbacks, data base tapes, mylar plots, composite plots and other items were recovered.[10] In executing the search at the SSI offices, several Intel and NSC engineers and security officers assisted the police in identifying items to be seized.[11]

## C. *Gopal's Defense*

### 1. *Introduction*

Appellant's factual defense at trial may be fairly summarized as assertions of legitimate "reverse engineering" concerning some materials and a lack of knowledge as to others, complicated by what might be described as "aggressive salesmanship" by appellant in his conversations with Worth and Dunlap.

Preliminarily, "reverse engineering" is an accepted and lawful practice in industry. It involves starting with a known product and working backwards to discover the process by which it was developed and manufactured. (See *Kewanee Oil Co.* v. *Bicron Corp.* (1974) 416 U.S. 470, 476 [40 L.Ed.2d 315, 322, 94 S.Ct. 1879]; see also 1984 U.S. Code Cong. & Admin. News, at pp. 5770-5772.) In the context of the semiconductor industry, it includes the purchase of several computer chips of a competitor, stripping layers, photographing the circuitry of each layer through a microscope, dissecting the chip to discover the actual layout design and then drawing inferences about the technical process used to make the device.

There was prosecution evidence that possession of by-products of the computer chip manufacturing process, such as data base tapes, reticles and overlays, would enable a manufacturer to bypass the substantial time and costs involved in circuit design, digitizing and checking; in short, all of the costs involved in generating the reticle and in reverse engineering the chip. This could involve several months time and perhaps hundreds of thousands of dollars in research and development.

### 2. *Appellant's Testimony*

Appellant testified that he was experienced in the art of reverse engineering. Concerning the Intel 2114 device (count 2), appellant at first denied

---

[10]The items recovered formed the basis for appellant's convictions of the four counts of stolen property. These are discussed more fully, *infra*.

[11]The validity of this search was upheld in *People* v. *Superior Court (Moore)*, *supra*, 104 Cal.App.3d 1001 [163 Cal.Rptr. 906].

having "at any time any material from Intel." (He later contradicted himself.) Appellant testified that what he had was basically a chip that he had developed in a joint venture with Maruman Integrated Circuits (MIC), using Intel's 2114 as an engineering source. Codefendant Catanich assisted in that project. Several Intel devices, including reticles, overlays and blowbacks, were found in the SSI offices during the September 27 search, some of which had never been licensed to others by Intel.

Concerning the other illegal possession offenses, Gopal testified that he had obtained the information on the Zilog Z80 design (count 6) from an Italian company. He denied ever seeing any NSC data base tapes (counts 8, 10) at SSI.

Appellant testified that he believed Catanich was authorized to possess most of the materials seized pursuant to the search warrant and that other items were possessed by Catanich without appellant's knowledge.

Appellant denied any attempt to bribe Worth in order to acquire an NSC trade secret. He indicated his belief that the requested data base tape of NSC's 8251 did not represent secret information. He also characterized his tape recorded offer to Worth as an offer made to NSC in a corporate sense, rather than as a bribe to Worth as an individual.

Finally, as to the more boastful of his many statements to Worth and Dunlap during the tape recorded negotiations regarding his access to and ability to provide genuine Intel devices, Gopal labelled such statements as "sales and marketing speeches," as "bullshit," or acknowledged them simply as "falsehoods."

## II. DISCUSSION

### A. *Appellant's Contentions*

Appellant challenges his convictions and sentence on several grounds: (1) Each count is challenged because none of the information claimed to be a trade secret is in fact or law a trade secret; (2) the four counts in violation of section 496 are challenged because (a) receiving copies of stolen trade secrets is not a crime and (b) there was a failure to prove these convictions were based on possession of physical things; (3) his rights to due process and a speedy trial were violated by lengthy delays in the presentation of his case; and (4) sentencing errors were committed requiring reversal and remand.

## B. *Trade Secrets*

### 1. *Introduction*

Appellant first challenges each count of which he was convicted, arguing that none of the information claimed to be a trade secret is in fact or law a trade secret. He so argues "because all of the information is disclosed by the product and [it] is freely available once the product comes on the market . . . ." Respondent emphasizes, however, that appellant was not prosecuted for reverse engineering any integrated circuit. Instead, the prosecution was founded on appellant's possession, copying and marketing of the reticles, blowbacks, and data base tapes that he had acquired from other companies' employees who were obligated not to disclose them.

Strictly speaking, the existence of a "trade secret" is an element in only one of the offenses of which appellant was convicted, namely count 18, offering a bribe to acquire a trade secret (§ 499c, subd. (c)).[12] After the court announced its verdict on July 13, 1981, however, appellant moved for clarification of the court's findings on counts 2, 6, 8, 10 and 21, the other counts of which he was found guilty.

At the hearing on the motion for clarification, the prosecutor stated that as to counts 2, 6 and 21 (see fn. 5, *ante*), the People relied on *two theories:* ". . . first, as we argued at trial, that the data contained in the reticles, both the Intel 2114 and Zilog Z80 reticles found in Mr. Gopal's possession at his business were trade secrets. [¶] Secondly, that the items themselves were stolen property, . . ." in that they were, in and of themselves, physical objects taken from NBK, and each had a substantial value. "With respect to Counts 8 and 10, that is the National Semiconductor counts, the People never put forth the argument that those tapes themselves, those physical tapes were National's property. The whole theory of the People's case was that the data contained in the tapes constituted a trade secret."

---

[12]As we shall see, *infra*, a fallacy in appellant's carefully built argument is in first characterizing the offenses of which he was convicted as "trade secret" offenses. He commences his argument, for example, by stating he was found guilty, in part, of "having in his possession items embodying trade secrets" and of "conspiracy to sell trade secrets." In fact, he was acquitted of several counts specifically alleging the theft of trade secrets in violation of section 499c, subdivision (b), including counts 1, 5, 7 and 9. These counts were factual parallels to counts 2, 6, 8 and 10, possession of stolen property (§ 496), of which appellant was convicted. Count 21 alleged a conspiracy to violate section 496. The term "trade secret" appears in none of those counts.

Based on his initial premise, appellant then argues primarily in terms of civil case law defining trade secrets. In doing so, he ignores significant parts of section 499c, which defines "trade secret" for purposes of California criminal law (see pt. II-B-2, *infra*), and fails to cite or otherwise deal with *People* v. *Serrata* (1976) 62 Cal.App.3d 9 [133 Cal.Rptr. 144, 84 A.L.R.3d 952], the leading case upholding and construing that statute.

Thereafter, in clarifying its own rulings, the court stated that as to counts 2 and 6, only, its findings were on the dual basis "that the evidence presented . . . was the embodiment of the trade secrets, and further they were physical items in fact stolen from NBK . . . ." Concerning the remaining counts, including count 21, the court's findings were based solely on the theory they involved "items which contained or are the embodiment of trade secrets; that is, copies of trade secrets."

Thus, while four of the counts of which appellant was convicted were for violations of section 496 and a fifth count was for conspiracy to violate section 496, with no allegations therein specifically referring to trade secrets, the trial court's clarified findings that the stolen property possessed by appellant "embodied trade secrets" makes it necessary for us to discuss the trade secret issue as it relates to each count. We find, however, that the evidence was sufficient to support the findings of the trial court under each theory considered.

### 2. Trade Secrets Under Section 499c

#### (a) General

During the time of the alleged offenses,[13] section 499c defined a trade secret as follows: " 'Trade secret' means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula or improvement which is secret and is not generally available to the public, and which gives one who uses it an advantage over competitors who do not know of or use the trade secret; *and a trade secret shall be presumed to be secret when the owner thereof takes measures to prevent it from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.*" (§ 499c, subd. (a)(3), italics added.) We note that in his opening brief, appellant omitted the emphasized portion of this statutory definition. Instead, appellant builds his arguments on judicial interpretations of the definition used in civil cases, taken from comment b to section 757 of the Restatement of Torts. (See *Futurecraft Corp.* v.

---

[13]Section 499c was amended in 1983. "Trade secret" is now defined in subdivision (a)(9), and now includes any "computer program or information stored in a computer, [or] information in transit . . . ." (Stats. 1983, ch. 933.)

Unless otherwise indicated, however, references to section 499c are to the version in effect during the time of the alleged offenses.

*Clary Corp.* (1962) 205 Cal.App.2d 279, 289 [23 Cal.Rptr. 198].)[14] ■
But section 499c, including its presumption, is a valid statute defining criminal misconduct. (*People* v. *Serrata, supra,* 62 Cal.App.3d 9, 23.) Its language cannot be so simply ignored.[15]

■ It is an axiom in our jurisprudence that when interpreting a statute, we should start with the language of the statute itself. "Penal Code sections must generally be construed ' "according to the fair import of their terms, with a view to effect its objects and to promote justice." ' " (*Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46]; § 4.) The plain meaning of words used in a statute is not to be disregarded. (*Morse* v. *Municipal Court, supra; People* v. *Baker* (1968) 69 Cal.2d 44, 50 [69 Cal.Rptr. 595, 442 P.2d 675].) " 'We must assume that the Legislature meant the section to be read as it was written . . . . *We cannot create . . . an offense by enlarging the statute, or by inserting or deleting words,* nor should we do so by giving a false meaning to its words. [Citations.] Such a practice makes it impossible for anyone to rely on the written word of the Legislature and only adds confusion to the already difficult task of drafting statutes.' " (*People* v. *Baker, supra,* at p. 50, deletions in original; italics added.)

(b) *Secrecy*

■ Turning to the statute, it provides that "a trade secret shall be presumed to be secret when the owner thereof takes measures to prevent it from becoming available to persons other than those selected by the owner to have access thereto for limited purposes." (§ 499c, subd. (a)(3).) The

---

[14]California recently adopted the Uniform Trade Secrets Act. (Stats. 1984, ch. 1724.) It provides for civil procedures and remedies, applicable to misappropriations on or after January 1, 1985. (Civ. Code, § 3426.10.) For new definition of trade secrets in civil proceedings, see Civil Code section 3426.1, subdivision (d). These provisions, of course, are wholly inapplicable to this criminal proceeding.

We are also aware of the Semiconductor Chip Protection Act of 1984 (17 U.S.C. § 901 et seq.), which was designed to protect mask works of semiconductor chip products against unauthorized duplication. Both the language and the legislative history of that act indicate that it, too, has no effect on these proceedings. Nothing in the act may "detract from any rights of a mask work owner" under the common law or statutes of a state "with respect to any mask work first commercially exploited before July 1, 1983." (17 U.S.C. § 912(e).) These crimes occurred between 1975 and 1978. Further, as trade secret laws provide a different form of protection than that found in the new Federal act, it was apparently the intent of Congress "that state laws protecting trade secrets shall not be preempted." (1984 U.S. Code Cong. & Admin. News, at p. 5777.) Appellant's reliance on trade secret theories applicable in civil proceedings thus becomes self-defeating.

Although the applicability of other state laws may be preempted by the Federal act after January 1, 1986 (see 17 U.S.C. § 912(c)), we need not decide the effect of that provision in this case.

[15]We note that appellant also fails to cite *Serrata* in either of his briefs, even though it is the only published case to discuss section 499c. It, too, should not have been ignored.

record is replete with evidence detailing the strict security measures taken by the owners of the semiconductor devices to prevent their reticles, data base tapes and other proprietary materials from falling into the hands of unauthorized persons.

At Intel, for example, elaborate security precautions were taken. Physical access to its plant was controlled through the use of guards, employee identification badges, visitor escorts and special sign-in procedures. The checkout of proprietary items were controlled by requiring superiors or managers to approve removal of the items from the work area, confidential materials were kept locked up, and certain documentary materials were shredded when no longer needed. Employees signed nondisclosure agreements when hired, upon termination, as well as periodically during the course of their employment. (Compare *People* v. *Serrata, supra,* 62 Cal.App.3d at p. 23 [security measures at IBM].)

At Zilog Corporation (count 6), there were similar security measures taken including a badge system for employees, sign-in procedures and controlled access by visitors, employee nondisclosure agreements, and property controls over items like composite drawings and blowbacks. Circuitry drawings, process information and other information relating to the Zilog Z80 were treated as proprietary and secret by Zilog.

Similarly, at NSC, there were security measures taken to protect its proprietary information, such as data base tapes, reticles, masks, and working plates. Again, these included guards, badges, document and property controls, employee nondisclosure agreements and similar measures.

Finally, firms such as Intel and Zilog contracted some of their work to mask vendors, such as NBK. In its contracts, NBK agreed to and did carry out very similar security measures to protect the proprietary information of the chip manufacturers that came into its possession. Thus NBK, too, had plant security, property controls (including security over pattern generator tapes and reticles), document controls and employee nondisclosure agreements and security briefings. Each NBK photomask division employee was required annually to sign that they had read and understood section 499c. NBK enforced these procedures in behalf of both Intel and Zilog corporations.

When owners of scientific or technical information take such security measures to protect their information from becoming available to unauthorized persons, it is more likely than not that such information is secret and intended by the owner to remain so. (*People* v. *Serrata, supra,* 62 Cal.App.3d at p. 23; § 499c, subd. (a)(3).) The issue of secrecy is a factual

one for the trial court. (*Components for Research, Inc.* v. *Isolation Products, Inc.* (1966) 241 Cal.App.2d 726, 729 [50 Cal.Rptr. 829].) ▮ There is abundant evidence indicating that Intel, Zilog, NSC, as well as NBK, the mask vendor, had taken measures sufficient to bring the presumed fact of secrecy set forth in section 499c into play.

(c) *General Unavailability*

To be a "trade secret" within the meaning of the Penal Code, the information, design, process, procedure, formula or improvement must not only be secret, but it must also be generally unavailable to the public and it must give one who uses it an advantage over competitors who do not know of or use the trade secret. (§ 499c, subd. (a)(3).)

On the issue of general unavailability, appellant focuses on the end product or device, e.g., the Intel 2114 device, as being the object of the thefts rather than the "reticles, overlays and blowbacks pertaining to" the Intel 2114, as charged in the indictment. The statutory definition refers not only to the end product, but also *"any portion or phase* of any scientific or technical information, design, process, procedure, formula, or improvement." Thus, the "trade secret" at issue in each count was not the final products, as suggested by appellant, but the "reticles, overlays, and blowbacks" or "data base tapes" pertaining thereto. (See fn. 5, *ante.*) As to these ancillary products which reflect an intermediate phase in the semiconductor manufacturing process, the evidence is overwhelming that they were not generally available to the public.

(d) *Competitive Advantage*

Finally, the availability of these products gave those who had them an advantage over those who did not know of or use them. Thus, even assuming an end product was already on the market and available to be reverse engineered, having originals or copies of a manufacturer's reticles, overlays, blowbacks or data base tapes would substantially reduce the amount of time necessary to reverse engineer a particular chip. We therefore conclude there was substantial evidence to support the trial court's findings based on the theory that the various items involved were "the embodiment of trade secrets."

(e) *Other Contentions*

Turning briefly to appellant's specific contentions concerning the items pertaining to Intel's 2114 device, the evidence showed that they related to a particular advanced version of that chip device, the 2114*E*. At their Sep-

tember 26 meeting at NSC, Gopal claimed to Tom Dunlap that his reticles and overlays pertained to that latest version. While other companies had successfully manufactured earlier versions of the 2114, Dunlap was unaware of any that had reproduced the "E" revision. So even the end product of the 2114E device was not generally available, as claimed by appellant.

We find appellant's specific arguments about the other items equally without merit.

### 3. *Receiving Copies of Stolen Trade Secrets Is a Crime*

Appellant next contends that receiving copies of stolen trade secrets is not a crime in California. Basically, his argument is that section 499c is a special statute governing thefts of trade secrets; section 496 is a general statute governing receipt or possession of stolen property; another special statute, section 496c governing thefts of real estate information contains within itself a prohibition on receipt of a copy of stolen real estate title information; because section 499c does not contain an analogous prohibition on receiving copies of stolen trade secrets, there is no legislative intent to proscribe such conduct. In support of this theory appellant cites the rule of statutory construction ". . . that where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes." (*People v. Norwood* (1972) 26 Cal.App.3d 148, 156 [103 Cal.Rptr. 7].)

Under another familiar rule of statutory construction, a special statute, dealing with a particular criminal act, will control or supersede a general statute, in whole or in part. (1 Witkin, Cal. Crimes, § 32, pp. 35-36.) Thus, if the property at issue herein involved receipt of copies of stolen real estate title information, the prosecutor would have had to charge that offense under the special statute referred to by appellant (§ 496c), rather than the general statute (§ 496) governing the possession of stolen property. (See, e.g., *People v. Gilbert* (1969) 1 Cal.3d 475, 481 [82 Cal.Rptr. 724, 462 P.2d 580] [special welfare fraud statute prevails over general grand theft statute].) But here, as there is no special statute to proscribe the receipt or possession of stolen trade secret property, it was proper to charge appellant under section 496.

Further, as respondent points out, section 499c, subdivision (b), declares that a person who, having obtained access to a trade secret through a relationship of trust and confidence, makes an unauthorized copy of any article representing a trade secret "is guilty of theft." Thus, respondent argues, "section 499c does not create a separate crime; it instead defines a species

of theft. Penal Code section 496, by its very words, makes it unlawful to buy or receive 'any property which has been stolen or which has been obtained in *any manner constituting theft.* . . .' Clearly, Penal Code section 496 encompasses the receipt or possession of articles obtained by theft as defined in section 499c. Anything that can be the subject of theft can also be property under section 496. *People* v. *Norwood* (1972) 26 Cal.App.3d 148, 157 [103 Cal.Rptr. 7]; *accord, People* v. *Kunkin* (1973) 9 Cal.3d 245, 250-251 [107 Cal.Rptr. 184, 507 P.2d 1392, 57 A.L.R.3d 1199]." (Original italics.)

We agree with respondent. ■ The major consideration in interpreting a criminal statute is the legislative purpose. "Hence the court will usually inquire into the evils which prompted its enactment and the method of elimination or control which the Legislature chose." (1 Witkin, Cal Crimes, § 11, p. 13.) At the time section 499c was enacted in 1967 there was growing concern in the business world with industrial espionage involving the discovery of secret scientific and technical information by surreptitious means. (See Comment, *Industrial Espionage: Piracy of Secret Scientific and Technical Information* (1967) 14 UCLA L.Rev. 911.) In enacting section 499c, the Legislature expressly declared its purpose was "to clarify and restate existing law with respect to crimes involving trade secrets and *to make clear that articles representing trade secrets, including the trade secrets represented thereby, constitute goods, chattels, materials and property and can be the subject of criminal acts.*" (Stats. 1967, ch. 132, § 1, italics added.)

■ An "article" representing a trade secret includes a "copy" of such article. (§ 499c, subd. (a)(1), (4).) Section 499c defines various species of theft. (§ 499c, subd. (b).) Anything that could be the subject of a theft can also be property under section 496. (*People* v. *Norwood, supra,* 26 Cal.App.3d at p. 157.) It therefore follows that receipt of a copy of stolen trade secrets is a crime in violation of section 496.

C. *Illegal Possession of Physical Objects*

When clarifying its verdict, the court stated that as to counts 2 and 6, its findings were on the dual basis that the property at issue was the embodiment of trade secrets and further, "they were physical items in fact stolen from NBK. . . ." Although we have already sustained the convictions on the grounds initially stated by the trial court, we nevertheless address appellant's challenges to the alternate grounds relied on by the trial court in support of the convictions of counts 2 and 6. His contentions consist of four parts. Although the first is based on *People* v. *Hitch* (1974) 12 Cal.3d 641

[117 Cal.Rptr. 9, 527 P.2d 361], all ultimately attack the sufficiency of the evidence.

### 1. *Hitch Argument*

Following appellant's arrest, copies of reticles for the 2114E were found at his business premises. Noel Suzuki, an employee of NBK, examined those 2114E reticles at the Santa Clara police station and compared them with master reticles then on file with NBK, concluding they were identical. Approximately a year after the indictment but before trial, NBK returned the master reticles to Intel in the normal course of business, and Intel routinely destroyed them. The reticles seized by the police nevertheless were available at trial. Furthermore, NBK had photographed the master reticles through a microscope before returning them to Intel. Based on his initial comparisons with the master reticles as well as comparing the seized items with the photographs immediately before trial, Suzuki was able to testify "with certainty" that a seized 2114E blowback, for example, was identical to an original master reticle that had been in NBK's possession.

■ Appellant seems to argue that the failure of NBK and Intel to preserve the master reticles violated his due process rights; testimony relating to the 2114E should therefore have been suppressed; and, in the absence of such testimony the evidence of guilt would be insufficient to support the conviction of count 2.

The court's ruling denying the motion to strike was a correct one. First, the *Hitch* rule does not apply when there is a nonmalicious loss or destruction of evidence in the possession of a third party that is not subject to control by the prosecution. (*In re Michael L.* (1985) 39 Cal.3d 81, 86 [216 Cal.Rptr. 140, 702 P.2d 222]; *People* v. *Lovett* (1978) 82 Cal.App.3d 527, 532-533 [147 Cal.Rptr. 136].) Second, the original master reticles were in NBK's possession for approximately a year, appellant and his attorney had equal access to them, but despite extensive pretrial litigation, they apparently never made any request for their production so they might be independently examined. (See *People* v. *Quinn* (1976) 57 Cal.App.3d 251, 255 [129 Cal.Rptr. 139].) Finally, photographs had been made of the master Intel reticles and these photographs were available at trial for comparison; therefore, that the originals were missing was immaterial. (See *In re Michael L., supra,* 39 Cal.3d at p. 87 [videotape of crime erased by victim; still photographs available]; *People* v. *Tolhurst* (1982) 139 Cal.App.3d 1, 7, fn. 4 [188 Cal.Rptr. 474] [tape recording destroyed after being transcribed; transcription available to defense; testimony that transcript was verbatim reproduction of tape].)

## 2. *Sufficiency of Evidence on Counts 2 and 6*

The remaining three contentions by appellant essentially relate to the sufficiency of the evidence based on the theory that the items referred to in counts 2 and 6 were stolen from NBK.

The prosecution's theory was that it was Lee Yamada who physically took the items from NBK and gave them to appellant. Carl Pompei, president of NBK, testified that Yamada worked at NBK from July 8, 1977, to September 5, 1978. Yamada was in charge of the photomask division and had access to all of the property kept there. The 2114E reticles at NBK were made during the period between June 27 and August 18, 1977, just after Yamada commenced working there. In his negotiations with Tom Dunlap, Gopal brought an Intel reticle and overlay with him and appellant specifically described it as a 2114E reticle. Further, the business records seized from appellant's office included checks made out from Gopal to Yamada for $446 and $500, bearing notations referring to the 2114 and Z80 devices.

■ On appeal a reviewing court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. If the circumstances reasonably justify the trial court's findings, an appellate court cannot reverse merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].) Although circumstantial in nature, we conclude that substantial evidence supports the trial court's implied finding that physical property was taken from NBK.

Appellant's final contentions attacking the sufficiency of the evidence are devoid of merit. In arguing there was insufficient evidence concerning the value of the glass plates, he overlooks Carl Pompei's testimony that reticles cost $200-$500 each. (*People* v. *Tijerina* (1969) 1 Cal.3d 41, 45 [81 Cal.Rptr. 264, 459 P.2d 680].) For offenses committed before January 1, 1983 (Stats. 1982, ch. 935), $200 was the dividing line between misdemeanor and felony treatment of section 496 violations. If the object of the offenses at issue are valued as trade secrets, rather than as mere physical property items, the value of these items was significantly higher. The price for which appellant had agreed to sell a 2114 data base tape, for example, was $100,000.

Finally, there was substantial evidence that appellant knew the glass plates taken from NBK were stolen. Throughout the record there is evidence that appellant represented that he had genuine Intel information for sale. "The things which I have are coming right out of Intel . . . ." They came to him

"from Intel in a roundabout way." During his meeting with Dunlap at NSC, he showed Dunlap an actual reticle and overlay from Intel and in Dunlap's presence, he took a piece of masking tape to cover up the "Intel" logo on the overlay. Finally, following his arrest, appellant requested $15,000 from Samuel Yoshikawa so he could hire two people to break into a school used temporarily as a police station, to steal the evidence of the crime that was stored there. This evidence was clearly sufficient to show appellant's guilty knowledge.

## D. *Denial of Speedy Trial*

Appellant next contends he was denied due process and a speedy trial by reason of lengthy delays in the presentation of his case.[16] As appellant had been brought to trial (see *Rhinehart* v. *Municipal Court* (1984) 35 Cal.3d 772 [200 Cal.Rptr. 916, 677 P.2d 1206]) and placed in jeopardy, respondent correctly characterizes the issue as whether or not the length of recesses or continuances ordered during the course of trial were within the sound discretion of the trial judge. After reviewing the record, it appears that there was good cause due to congested court conditions attributable to exceptional circumstances to justify the interruption in the trial. But assuming there was error in that only one day of testimony (Mar. 11) was held during the ten-and-one-half-week period between February 5 and April 22, 1981,[17] we do not believe appellant suffered prejudice as a result of this gap in the proceedings.

Appellant argues that the lengthy delays were caused by the court and were neither requested nor in any way caused by the defense.[18] Although

---

[16]A motion to dismiss was filed on these grounds on March 9, 1981.

[17]In his briefs appellant asserts the People's case spanned 20 court days between November 5 and December 30, 1980, while the defendant's case "consumed only thirteen Court days, but spanned December 31, 1980 to April 25, 1981." He argues that the "lengthy and inexcusable delays which occurred only during the presentation of Defendant's case" denied him his constitutional rights. The record reads somewhat differently.

The People actually rested their case on December 17, 1980, the 15th day of trial. Proceedings held on December 17, 18 and 29 were occupied primarily by appellant's largely successful motion to exclude evidence and an unsuccessful motion to acquit under section 1118.

Appellant's counsel made an opening statement on December 29, 1980, and presented evidence on December 30 and 31, 1980; January 2, 14, 15, 21, 22 and 23; February 4 and 5; and on March 11, 1981—a total of 11 trial days of defense evidence. Appellant rested his case on March 11th. Thus, more accurately, appellant's case spanned approximately 10½ weeks with one prolonged delay from February 5 to March 11, 1981.

Following the second lengthy gap in the proceedings, the prosecution presented its rebuttal on April 22 and 23, 1981, and final arguments were made on April 23 and 24, 1981.

[18]The record is actually more mixed as to the underlying causes in the delays. In its trial memorandum the defense conceded difficulty in arranging its witnesses at the inception of its case in late December and early January. At one point "the court recessed at the defense's

the record indicates some delays during the trial were brought about by the opposing sides, the significant cause of the prolonged gaps in trial testimony during the period February 5 to April 22, 1981, were conflicting demands placed upon the judge in his role as presiding judge of the court. It appears that due to the complexity of this case, each side initially had waived a jury trial with the understanding that Judge Stone would transfer his administrative duties as presiding judge to another judge during November and December 1980. Judge Stone gave substantially full time to this case during that time period. But when the case went beyond its initial two-month estimate, Judge Stone had to resume his administrative duties as presiding judge. This coincided timewise with a "criminal justice crisis" within Santa Clara County which imposed unusually heavy time demands upon Judge Stone as he worked to resolve many problems in behalf of the court.

According to a declaration submitted by the prosecutor: "Beginning in January, 1981, JUDGE STONE resumed his duties as Presiding Judge, as he had previously indicated he would. This occurred in a time of crisis for the criminal justice system in Santa Clara County. The felony trial calendar in the first quarter of 1981 groaned under an unprecedented number of cases, at time in excess of three hundred in a given week. . . .

"As the calendar swelled, so did the population of prisoners awaiting trial in the County Jail. Extraordinary measures were instituted and administered by JUDGE STONE, who personally directed the effort to solve the problems. Own-recognizance release guidelines were re-evaluated and changed; new prisoner housing arrangements were instituted in collaboration with the Sheriff's Office; the Board of Supervisors was successfully lobbied to provide new funds for additional prosecutors and public defenders; *in-custody, no time waiver cases nearly monopolized the trial departments; retired judges were pressed into service; one whole week in February was set aside where all trial departments were assigned solely to mandatory settlement conferences.* Finally, a wholly new felony trial calendaring system was conceived and implemented, replacing a system which had remained essentially unchanged for ten years." (Italics added.)

Because multijudge courts must ordinarily have sufficient criminal departments established to handle all criminal matters in a timely manner, and because the Judicial Council may assign additional judges to meet any

request so that the defense could arrange to bring in some witnesses as soon as possible."

During the gap in February and early March, originally scheduled to last two weeks, the prosecutor became engaged in a separate no time-waiver jury trial and also had to take time off work for personal and family reasons.

Fundamentally, however, the delays with which we are concerned were brought about by conflicting time demands upon the trial judge, once 1981 commenced, in his capacity as presiding judge.

emergency that arises, the excuse that there are too many cases and a shortage of judges to try them is ordinarily rejected as a justification for delay in bringing a criminal case to trial. (See *Rhinehart* v. *Municipal Court, supra,* 35 Cal.3d at pp. 781-782; *Perez* v. *Superior Court* (1980) 111 Cal.App.3d 994 [169 Cal.Rptr. 45]; *Tudman* v. *Superior Court* (1972) 29 Cal.App.3d 129 [105 Cal.Rptr. 391].) Good cause may exist, however, when due to exceptional circumstances the court's calendar is congested, judges and commissioners have given exclusive attention to criminal matters and the Judicial Council is unable to offer assistance. But the prosecution has the burden to show that this condition exists. (*Rhinehart* v. *Municipal Court, supra,* 35 Cal.3d at pp. 780-782.)

Although not as explicit as it could be in satisfying the prosecution's burden to show good cause, the logical inference of the prosecutor's declaration is that the full resources of the Santa Clara Superior Court were devoted to the handling of criminal matters, and that the retired judges pressed into service had been assigned following a request to the Judicial Council pursuant to section 1050. The trial court expressly found that "the continuances of the trial of the defendant were caused by a series of calendar problems and crises coupled with the unforeseen length of this action." Absent any contradictory declarations or evidence offered by appellant, we conclude there was a sufficient showing that good cause existed for the prolonged recesses ordered by Judge Stone between February 5 and April 22, 1981.

Assuming there was error, however, in the fact there was only one trial date during this ten-and-one-half-week period, we do not believe appellant was prejudiced. Appellant first asserts an inherent prejudice in that he was deprived of employment and subjected to public scorn, including being "blacklisted" in his chosen profession. First, we note that the time in issue is significantly less than the approximately two-year period between arrest and indictment and the commencement of trial, most of which elapsed time was brought about by defense pretrial motions and writ proceedings and during which defendant suffered from these same hardships. Further, appellant's suggested cure to bring in a new judge pursuant to section 1053 would run counter to his best interests. To proceed from midtrial would seem wholly inappropriate in a court trial with the judge as factfinder, particularly in a case of this magnitude. To start the trial anew would have required the repetition of two months or more of complex evidence. The best cure was to resume the trial and to complete it as expeditiously as possible. That is what was done.

Appellant also argues his defense was prejudiced in that the delays made it more difficult for the trier of fact to recall the testimony, particularly

where, as here, the defendant's presentation had become disjointed in time while much of the prosecution's case was memorialized by tape recordings, with accompanying transcripts. But the trial judge, as the finder of fact, was in a peculiarly unique position to assess this argument. In contrast to a jury trial, he said, "a judge, I think, is expected to keep accurate and comprehensive notes to insure a fair judgment. That has taken place here."

Finally, the court found the defendant had not made a sufficient record of objections regarding the continuances in order to preserve his claim. His motion to dismiss was not filed until March 9, 1981. A trial date was held on March 11, 1981, on which date appellant rested his case.

For the reasons already alluded to, this case is distinguishable from *People* v. *Engleman* (1981) 116 Cal.App.3d Supp. 14, 20-21 [172 Cal.Rptr. 474] (prejudice inherent in jury trial where three-week continuance ordered between prosecution and defense case). This was a court trial and the judge expressly found there was no prejudice. The final verdict evidences the fact that the judge carefully scrutinized the evidence, finding defendant guilty on six counts, not guilty on nine counts, dismissing seven counts, and finding one count inapplicable to appellant. In the face of Judge Stone's express finding of no prejudice, and the discriminating nature of the court's verdict, appellant's assertion of prejudice from the recesses during trial is pure speculation.

E. *Alleged Sentencing Errors*

Finally, appellant alleges a series of errors during his sentence proceedings.

1. *Denial of Probation*

First, citing *People* v. *Enright* (1982) 132 Cal.App.3d 631 [183 Cal.Rptr. 249], appellant argues the trial court did not adequately state its reasons for denying probation. At sentencing the trial court, by rule number only, cited a series of sentencing rules unfavorable to a grant of probation ("Rule 414c(1), c(2), c(5) through c(8), and d(9)") and a series of rules favorable to a grant of probation ("414a, b, c(3) and (4), d(1), d(3) through (8)").[19] It then announced that in "weighing the factors, one against the other, I find on balance that the unfavorable factors outweigh by some heavy weight the favorable." For those reasons, probation was denied. In *Enright,* decided several months after the sentencing in this case, it was held that a similar pronouncement was an inadequate statement of reasons for a sen-

---

[19]Rule references are to the California Rules of Court.

tence choice involving an upper term of imprisonment. (*Id.*, at pp. 636-637.) But the denial of probation is not a "sentence choice" within the meaning of the sentencing statutes or rules. Therefore, there was no error.

Rule 443 provides, in part: "Whenever the giving of reasons by the sentencing judge is required, the judge shall state in simple language the primary factor or factors that support the exercise of discretion . . . ." Section 1170, subdivision (c), requires the court to "state the reasons for its *sentence choice* on the record at the time of sentencing." (Italics added.) A "sentence choice" is defined as "the selection of any disposition of the case which does not amount to a dismissal, acquittal, or grant of a new trial. It includes the *granting of probation* and the suspension of imposition or execution of a sentence." (Rule 405(f), italics added.) The rules make no reference to the *denial* of probation as a "sentence choice." (See *People* v. *Butler* (1980) 107 Cal.App.3d 251, 254 [165 Cal.Rptr. 709]; *People* v. *Ramos* (1980) 106 Cal.App.3d 591, 599 [165 Cal.Rptr. 179].)

Recent decisions are at variance as to whether a trial court imposing the middle term of imprisonment, as in this case, must state reasons for denying probation. (See *People* v. *Mobley* (1983) 139 Cal.App.3d 320, 324 [188 Cal.Rptr. 583]; compare, e.g., *People* v. *Butler, supra,* 107 Cal.App.3d 251 with *People* v. *Arceo* (1979) 95 Cal.App.3d 117 [157 Cal.Rptr. 10].) But in only one of those cases (*People* v. *Ramos, supra,* 106 Cal.App.3d at p. 599) was the Advisory Committee comment pertinent to this issue cited: "Neither section 1170(c) nor these [sentencing] rules requires the judge to give reasons explaining why possible dispositions were rejected; for example, the judge must state his reasons for imposing a prison sentence, but *need not explain why he denied probation* . . . ." (Advisory Committee com. to rule 443.)

In cases arising prior to the effective date of the Determinate Sentencing Law, the Supreme Court had held that a statement of reasons by the sentencing judge for denying probation, even when the denial of probation was contrary to a recommendation for probation, was neither constitutionally required nor required in the exercise of the Supreme Court's supervisory authority over state criminal procedure. (*People* v. *Edwards* (1976) 18 Cal.3d 796 [135 Cal.Rptr. 411, 557 P.2d 995].) The Judicial Council and its Advisory Committee, because of their membership including justices and judges with extensive experience in determining sentences, were uniquely situated to carry out the delegated duty of implementing the determinate sentencing law. (See *People* v. *Wright* (1982) 30 Cal.3d 705, 713 [180 Cal.Rptr. 196, 639 P.2d 267].) The Advisory Committee and Judicial Council were aware of the *Edwards* decision. (See Advisory Committee com. to rule 441, citing *Edwards* on another point.) Yet they decided against a rule

requirement that a statement of reasons be given when probation is denied. We therefore conclude that no statement of reasons was required by the court in denying probation. (*People* v. *Butler, supra,* 107 Cal.App.3d at pp. 253-254; see also *People* v. *Jardine* (1981) 116 Cal.App.3d 907, 923 [172 Cal.Rptr. 408] [*Edwards'* rule applies to sentences under the Determinate Sentencing Act].) The fact the trial judge chose to state reasons, but in doing so did it by references to rule numbers only, was not error.[20]

### 2. *Consecutive Sentences*

■  Next, appellant complains the trial judge gave inadequate reasons for imposing consecutive sentences. After denying probation, the trial court stated: "With respect to each of the counts, I find that there are really two courses of conduct here; . . ." one represented by counts 2, 6, 8 and 10 and the other by counts 18 and 21. After dividing the offenses into the two groupings, the court sentenced appellant to a concurrent middle term of two years for counts 2, 6, 8 and 10 (staying the sentence as to count 10) and a concurrent eight-month sentence as to counts 18 and 21. Then, repeating its finding of "a separate course of conduct," the court sentenced appellant to consecutive terms of imprisonment with respect to each group, for a total prison sentence of two years and eight months.

Rule 425(a)(1) includes among the criteria affecting the decision to impose consecutive rather than concurrent sentences the fact that "[t]he crimes and their objectives were predominantly independent of each other." We have previously held that a trial court is not precluded from acting on a finding of only one of several circumstances in aggravation. (*People* v. *Covino* (1980) 100 Cal.App.3d 660, 670 [161 Cal.Rptr. 155].) The trial court's statement was a sufficient statement of reasons for imposing a consecutive sentence.

### 3. *Multiple Punishment Under Section 654*

■  Next, appellant contends the trial court misapplied section 654 in imposing consecutive sentences for the four counts of possessing stolen goods and for the bribery and conspiracy counts. We disagree. In *People* v. *Beamon* (1973) 8 Cal.3d 625 [105 Cal.Rptr. 681, 504 P.2d 905], the Supreme Court held section 654 "to be applicable to limit punishment for

---

[20]Our holding finds support within the *Enright* decision relied upon by appellant. *Enright* complained that no reasons were stated for denying either a private narcotic treatment program or a CRC commitment. Citing both *Edwards* and the language quoted above from the Advisory Committee comment to rule 443, the *Enright* court found "no authority requiring a statement of reasons in these circumstances, nor is there good reason for imposing such a requirement . . . ." (*People* v. *Enright, supra,* 132 Cal.App.3d at p. 637.)

multiple convictions arising out of either an act or omission or a course of conduct deemed to be indivisible in time, in those instances wherein the accused entertained a principal objective to which other objectives, if any, were merely incidental." (*Id.*, at p. 639, fn. omitted; see also *People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].) In a footnote to its holding, the Supreme Court emphasized: "It seems clear that a course of conduct *divisible in time*, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]" (*People* v. *Beamon, supra,* 8 Cal.3d at p. 639, fn. 11, italics added.)

Thus, count 18 alleging the offering of a bribe on September 19, 1978, to Larry Worth in order to acquire the trade secrets of NSC involved a separate act or course of criminal conduct divisible in time from the four counts of illegal possession of stolen property. It is reasonable to infer from the earlier offer made by Gopal and Moore to Worth to sell the information they had obtained from Intel that the stolen property had been in their possession long before the offering of the bribe.

Further, as to count 21 alleging the conspiracy, an "intent or objective" separate from the mere possession of stolen property may be discerned from the evidence. In *People* v. *Rowland* (1971) 21 Cal.App.3d 371 [98 Cal.Rptr. 419], the defendant was sentenced for (1) receipt of stolen property, i.e., a wallet and its contents; and (2) petty theft through acquiring a credit card without the owner's consent with intent to use or sell it. The court in *Rowland* held that while the single act of receiving stolen property gave defendant possession of the stolen credit cards, defendant, by keeping them, added another criminal act, namely, keeping possession of credit cards which he had no right to have for the purpose of using or selling them. (*Id.*, at p. 375.) Similarly, in this case, in the four counts alleging violations of section 496, appellant's only offense was keeping the stolen property knowing them to be stolen. As to count 21, particularly with the overt acts *alleged, proved and found* to the effect that appellant intended to unlawfully use and sell the stolen property, appellant had an intent or objective and was violating a law other than that which merely prohibits possession of stolen property. (*People* v. *Rowland, supra;* see also *People* v. *Miller, supra,* 18 Cal.3d at p. 886 [court looked to robbery and burglary as alleged, proved and found to conclude they were separately punishable violent crimes].) We therefore conclude that the court did not misapply section 654 when imposing separate prison terms for the two groups of offenses herein.

### 4. *Identity of Offenses*

Finally, appellant alleges that count 10, alleging possession of certain NSC property on September 22, 1978, was necessarily included in count 8,

alleging possession of similar NSC property during the period between November 8, 1975, and September 27, 1978. Count 10 was based on a specific incident involving appellant and codefendant Jim Catanich in editing certain NSC data base tapes at the Transmask Corporation on September 22, 1978. Assuming that count 10 was a necessarily included offense of count 8, the remedy is not to reverse the conviction as to count 10, but to stay the execution for count 10 pending completion of service of the sentence as to count 8. (See *People* v. *Miller, supra,* 18 Cal.3d at pp. 886-888; *People* v. *Niles* (1964) 227 Cal.App.2d 749, 755-756 [39 Cal.Rptr. 1].) That is exactly what the trial court did in this case.

The judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 19, 1985. Grodin, J., did not participate therein.