PETER K. GOPAL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gopal v. Commissioner
Docket No. 21531-82.
United States Tax Court
T.C. Memo 1988-394; 1988 Tax Ct. Memo LEXIS 414; 55 T.C.M. (CCH) 1694; T.C.M. (RIA) 88394; August 23, 1988. *414 On the facts, held: the Commissioner did not err in determining that various unexplained bank deposits, together with substantial capital contributions to a partnership, the source of which contributions petitioner could not adequately explain, constituted taxable income to petitioner for 1978, and interest on one of petitioner's bank accounts constituted taxable income to him; held further, petitioner is liable for the addition to tax for fraud under section 6653(b), I.R.C. 1954. Harry J. Kaplan, for the petitioner. Steven A. Wilson, for the respondent. NIMS
*415 MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Chief Judge: Respondent determined a deficiency in petitioner's 1978 Federal income tax in the amount of $ 309,974.14 and an addition to tax for fraud under section 6653(b)[1] in the amount of $ 154,987.07. The issues for decision are: 1) *416 Whether deposits of $ 352,914.40 to petitioner's bank accounts and $ 125,990.00 of partnership capital contributions represented unreported income; 2) Whether $ 144,000.00 withdrawn from Semiconductor Systems International, Inc.'s bank account and deposited into a bank account maintained for petitioner constituted income; 3) Whether interest in the amount of $ 1,045.87 earned on petitioner's bank account was reportable by him as income; and 4) Whether petitioner is liable for the addition to tax for fraud under section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time he failed his petition, petitioner Peter K. Gopal resided in Santa Clara, California. Petitioner's Educational Background and Employment History
Petitioner was born in Singapore on February 23, 1938. He later studied in England and received a degree in electrical engineering. He worked in England until 1966 and then emigrated to the United States. Upon coming to the United States, petitioner initially worked for AVCO Engineering *417 in Cincinnati, Ohio. He was employed by AVCO for two years and engaged in electrical engineering and electronics work. Petitioner then obtained employment with Texas Instruments. While with Texas Instruments, he began to concentrate and specialize in work in the semiconductor technology field. After a year of working for Texas Instruments, petitioner took a position with Philco Ford in Pennsylvania. His work with Philco Ford also involved semiconductor technology. Petitioner then worked briefly in San Diego, California, for Solatron Devices as that company's director of engineering. Petitioner then worked for Collins Radio as a marketing manager in Newport Beach, California, until late 1972. In 1970, petitioner also attended Southwest College of Law in Houston, Texas. He completed courses in contracts, torts, wills and real property. Petitioner has also taken and completed some courses in accounting. Petitioner, Rudolf Sacher and Semiconducter Systems International, Inc.
In 1973, petitioner and two associates, Rudolf Sacher and Carl Heinz Pfneudl, formed Semiconductor Systems International, Inc. (SSI), a California corporation. The corporation's stated *418 business purpose was the design and manufacture of semiconductor devices and electronic systems. Petitioner, Sacher and Pfneudl acquired all of SSI's stock. Petitioner received his SSI shares in return for transferring certain electrical devices, sundry computer programs, design know-how on various circuits and semiconductor systems and certain machinery and equipment. The property transferred by petitioner to SSI was determined by the company's board of directors to have a value of $ 75,000. Petitioner owned a one-third stock interest in SSI during the period from 1973 through 1977. In 1978, petitioner held a 67 percent interest in SSI following Pfneudl's sale of his SSI share to Sacher. SSI, from the time it was incorporated in 1973 until the time of its dissolution in 1980, maintained its offices in Sunnyvale, California. Petitioner during this period was SSI's president. He was also the corporation's treasurer and a director of the company. He personally maintained the company's books from March 11, 1975, through September 24, 1978. Sacher and Pfneudl were citizens and residents of Austria. During the years 1976 through 1978, the majority of SSI's sales were *419 to the following foreign companies: Rudolf Sacher Gesellschaft, Implama, Sacher Technik Wien and Optron AG. Rudolf Sacher Gesellschaft and Sacher Technik Wien were Austrian companies owned by Sacher. Implama was a foreign corporation which maintained offices in Vienna, Austria. Sacher was a shareholder of Implama. Optron AG was a Swiss corporation. During 1978, Sacher was petitioner's marketing agent in Europe. Petitioner had signatory authority over Sacher's account at the Union Bank of Switzerland. Sacher had also granted petitioner a power of attorney over an account in Sacher's name at the Vienna, Austria, branch of the Bank of America. Additionally, Sacher was trustee of another Swiss company, Gesellschaft Fuer Handel und Finanzierung AG (GHF). Max Peterhans, GHF's managing director, also served as president of Optron AG and as an officer of Implama. Petitioner's 1978 Sales of Computer Trade Secrets
During the five-year period ending with his arrest on September 27, 1978, petitioner was engaged in obtaining and selling trade secrets and information on the products of various Silicon Valley computer technology firms. [2] The bulk of petitioner's sales during *420 this period were made in Europe. On or about May 2, 1978, Maruman Integrated Circuits, Inc. (Maruman), a corporation *421 maintaining offices in Sunnyvale, California, entered into an agreement to acquire from petitioner detailed design information about Intel Corporation's 2114 microcomputer chip. At petitioner's request, a $ 60,000 purchase order from Maruman was issued to Optron AG. The agreement between Maruman and Optron AG was confirmed by a letter dated May 1, 1978, from petitioner on Optron AG's stationary and signed by petitioner on behalf of Peterhans, as president. The May 2, 1978, Maruman purchase order called for delivery of the design information on the Intel 2114 chip to Maruman on May 3, 1978. The $ 60,000 fee to Optron AG was stated to be for the "design of a produceable circuit." The fee was payable in the following installments: (1) $ 20,000 on Maruman's acceptance of the prototypes; (2) $ 20,000 on Maruman's shipment of the first 10,000 of production parts; and (3) the remaining $ 20,000 on Maruman's shipment of the next 15,000 of production parts. In addition to the $ 60,000 fee, as part of the transaction Maruman was to provide petitioner with information on two Maruman products. Petitioner was subsequently arrested and convicted as a result of his attempts to sell design *422 and manufacturing process information about various Intel Corporation products to National Semiconductor Corporation (National Semiconductor), as described below. [3]
On September 11, 1978, the purchasing manager for National Semiconductor's computer operations group participated in a sales meeting with a Japanese semiconductor manufacturer. The meeting was also attended by Andrew Moore, an associate of petitioner. During the meeting, Moore took the National Semiconductor purchasing manager aside and asked whether he would be interested in purchasing information about certain Intel fast memory chips together with the process for manufacturing them. The purchasing manager informed his superiors at National Semiconductor of the offer. His superiors in turn contacted Intel Corporation. The management of National Semiconductor and the management of Intel Corporation decided to conduct a joint undercover investigation or "sting operation." The two companies received the assistance of the Santa *423 Clara, California, police, who provided surveillance equipment which allowed the subsequent meetings between petitioner, Moore and the undercover operatives to be taped. During the undercover operatives' meetings with petitioner, various Intel Corporation products and petitioner's prices for information on them were discussed. Combined prices totalling $ 1.8 million were quoted by petitioner for information on four Intel products. Throughout the discussions, the undercover operatives repeatedly sought assurances that they would be purchasing Intel Corporation's actual product designs and manufacturing processes, and not the designs and manufacturing processes for facsimiles or copies of Intel products. While assuring the operatives that he possessed the actual Intel designs and manufacturing processes and not facsimilies or copies, petitioner declined to produce any corroborating Intel Corporation internal documents or materials. Petitioner and Moore explained that such documentation could later be used as conclusive evidence that the information was stolen. [4] Petitioner further stated that while the designs that he would furnish were superficially modified to disguise their *424 origin, the products produced would be completely interchangeable with the genuine Intel products and meet all product specifications and requirements. Petitioner maintained that National Semiconductor could verify the authenticity of the designs by producing the products and testing them against the Intel-produced products. In some instances, petitioner offered to furnish working prototypes of the designs, which he said had been built in Europe. *425 When the method for payment was discussed, petitioner suggested that payment be made by National Semiconductor by check to Moore's Hong Kong company and that the Hong Kong company give National Semiconductor an invoice or bill for "design and consulting" work. During this discussion, the undercover operative had insisted that National Semiconductor receive an invoice so that it could deduct the payment for tax purposes. He dismissed Moore's suggestion that National Semiconductor simply juggle its books. Petitioner concurred that National Semiconductor should receive an invoice and added that his Swiss company could issue the invoice if Moore's Hong Kong company was unable to do so. [5]
*426 During one meeting, petitioner offered one of the undercover operatives $ 10,000 cash for design information on a National Semiconductor chip which petitioner was interested in. When the operative wondered about the personal legal consequences of such a transaction, petitioner promised that the chips produced from the National Semiconductor design would be produced abroad and not sold in any competitive market. Petitioner stated that most of his foreign clients used only "in-house" the products which they acquired from petitioner. As petitioner did not yet have available information on one of the Intel products in which the operatives were interested, the discussions focused on only one particular product, the Intel 2114 memory chip. Petitioner initially quoted prices of $ 150,000 for the 2114 chip's design and $ 250,000 for its manufacturing process. He subsequently offered to sell both the design and manufacturing process to National Semiconductor for $ 250,000. Petitioner stated that he was selling the same items in Europe for $ 1.5 million. It was eventually agreed that petitioner would initially provide certain design materials on the 2114 memory chip in exchange for *427 $ 100,000 in blank traveler's checks. At the final meeting, the undercover operative brought only $ 25,000, explaining to petitioner that he wanted to take the materials back to his company for verification and, if his company was satisfied, would return with the remaining $ 75,000. As petitioner and the undercover operative exchanged the $ 25,000 and the design materials, the operative signaled the police who had been monitoring the meeting to make the arrest, which was done. Following petitioner's arrest on September 27, 1978, the police obtained warrants to search petitioner's home and business offices. In the searches conducted, a large amount of Intel Corporation proprietary design and manufacturing process materials for various Intel products were recovered. Proprietary materials relating to the products of other computer technology firms were also found. Petitioner was indicted by the State of California and found guilty of felonies stemming from his (1) conspiring to sell certain Intel Corporation proprietary trade secrets, (2) offering a bribe to acquire National Seminconductor trade secrets, and (3) illegally possessing design materials relating to the Intel 2114 *428 chip, certain Zilog Corporation products and certain National Semiconductor products. He received a sentence of two years and eight months in California state prison as a result of his conviction. Petitioner's Cash Transactions, Investments and Bank Accounts
Petitioner purchased 500 shares of Amdahl stock on January 23, 1978, for $ 24,535.63 in cash. He purchased another 500 shares of Amdahl stock on March 1, 1978, for $ 23,716.65 in cash. The Amdahl shares were purchased in the names of petitioner and his then wife, Diana Gopal (Diana). The cash used to purchase the share came from petitioner's personal funds and from funds of his corporation SSI. Petitioner and five other individuals formed the partnership Gopal Properties I on May 9, 1978. Gopal Properties I was formed for the purpose of acquiring and developing a parcel of land in San Jose, California, known as J-3. Petitioner and Sacher each owned a 20 percent interest in Gopal Properties I; the other remaining 60 percent interest in the partnership was held by associates or friends of petitioner or by friends of petitioner's associates and friends. Petitioner and three other Gopal Properties I partners were *429 involved as partners in the purchase by the partnership of the J-3 property, which took place on June 5, 1978. Petitioner paid $ 5,000 to a title insurance company on May 8, 1978, in connection with the purchase of the property. During 1978, petitioner contributed $ 125,990 to the capital of Gopal Properties I. Additionally, in June, 1978, he made two loans to the partnership in the respective amounts of $ 150,000 and $ 50,000. The source of the $ 50,000 loan by petitioner to the partnership was a loan petitioner received from California First Bank. The $ 150,000 loan from petitioner was to be repaid by the partnership over 36 months, with interest at 9.5 percent per annum. Gopal Properties I was to make monthly payments to petitioner in the amount of $ 4,804.80. The partnership made three monthly payments to petitioner on or about July 11, 1978, August 7, 1978 and September 5, 1978, respectively. On May 1, 1978, petitioner paid $ 34,806.74 in cash to purchase real property known as Lot 1, Block K, Unit Number 3, located at 702 Golfers Pass Road, Incline Village, Nevada. The property was purchased in the name of petitioner and Diana. On December 28, 1978, petitioner *430 purchased another parcel of property in San Jose known as G-3. The parcel was purchased in the name of "Peter K. Gopal, a married man." The funds used to make the purchase came from an account petitioner had had opened in the name of his friend Sam Yoshikawa (Yoshikawa) following petitioner's arrest on September 27, 1978. Petitioner loaned $ 20,000 to Yoshikawa to allow him to invest in the Gopal Properties I partnership. Petitioner on August 1, 1978, also loaned $ 20,000 to his associate Andrew Moore. A binder maintained by petitioner contained his following four handwritten entries: --
Optron 1st Payment
79,439.00
5/22/78
Optron 2nd Payment
161,464.00
9/12/78
Optron 3rd Payment
136,860.00
9/12/78
Loan from RS
135,000.00
The same binder also contained the following handwritten entries under the heading "UBS # 749:616": Deposit
Drawn
Balance
5/22/78
Check from Optron
161,464.00
5/22/78
Transferred to RS
150,000
11,464.00
U.S. Account
Petitioner had signatory authority over an account in Sacher's name at the Union Bank of Switzerland, account number XXX.616. On July 10, 1978, an account *431 was opened by petitioner at California First Bank, savings account number XXXX-XX2116. The following amounts were deposited to the account on the dates indicated: Date
Amount
7/10/78
$  60,000.00
7/11/78
4,804.80
8/7/78
4,804.80
8/30/78
6,500.00
9/5/78
4,804.80
9/20/78
$ 270,000.00
The three deposits each in the amount of $ 4,804.80 made on July 11, 1978, August 7, 1978 and September 5, 1978, were loan repayments by Gopal Properties I on the $ 150,000 loan the partnership received from petitioner. Another account was opened by petitioner at California First Bank, account number XXXX-XX1738. The account was opened on June 7, 1978, with a deposit in the amount of $ 2,000. The deposits made to petitioner's two California First Bank accounts -- savings account number XXXX-XX2116 and account number XXXX-XX1738 -- were not from gifts or inheritances. In 1978, $ 1,045.87 of interest was earned on petitioner's California First Bank account, savings account number XXXX-XX2116. On September 29, 1978, following petitioner's arrest, his wife Diana, pursuant to a power of attorney granted by petitioner, made two withdrawals from the California First *432 Bank account, savings account number XXXX-XX2116, in the amounts of $ 46,781.89 and $ 2,005.62 from the California First Bank account, account number XXXX-XX1738. On September 29, 1978, a loan to petitioner from the Bank of Tokyo of California was fully paid off by a payment of $ 46,781.89. The loan had been obtained by petitioner to provide funds for the Gopal Properties I partnership's acquisition of the J-3 property. Subsequent to petitioner's arrest, he and his friend Yoshikawa agreed that petitioner's funds would be placed in an account in Yoshikawa's name and that Yoshikawa would hold the funds in trust for petitioner, would use the funds only according to petitioner's directions and would return the funds upon petitioner's request. Yoshikawa opened an account in his own name at California First Bank, being account number XXXX-XX3296. The $ 282,131.51 withdrawn by Diana from petitioner's account at California First Bank was deposited into this account in Yoshikawa's name. Similarly, the $ 2,005.62 which Diana had withdrawn from petitioner's other California First Bank account was also deposited in this account. On or about October 5, 1978, $ 144,000 was withdrawn *433 from SSI's bank account at the Ban of America. Petitioner had sole signatory authority over SSI's Bank of America account. The $ 144,000 in funds were deposited into the California First Bank account in Yoshikawa's name, account number XXXX-XX3296. Funds from the California First Bank account maintained in Yoshikawa's name were used to pay petitioner's bond and some of his attorney's fees. Additionally, over $ 156,000 from the Yoshikawa account was retransferred to petitioner. Petitioner had instructed Yoshikawa to first transfer some of the funds in the California First Ban account, account number XXXX-XX3296, to several of Yoshikawa's friends in amounts of under $ 10,000 so that the transactions would not be reported. After receiving funds from Yoshikawa, each of Yoshikawa's friends deposited the funds in an account opened in his own name, but gave the account's passbook to Yoshikawa. Over $ 156,000 in these accounts were later retransferred to petitioner. Petitioner's Individual Tax Returns and SSI's Tax Returns
Petitioner and Diana on their joint 1975 individual income tax return reported $ 6,484.42 in total gross income. The $ 6,484.42 consisted of $ 4,800.00 *434 in wages, salary tips and other employee compensation, $ 46.39 of interest income and $ 1,638.03 of income other than wage, dividends or interest. Petitioner and Diana on their joint 1976 individual income tax return reported $ 25,115 in total gross income. The $ 25,115 consisted of $ 21,262 in wages, salary, tips and other employee compensation, $ 10 of interest income and $ 3,843 of income other than wages, dividends or interest. The Form W-2 attached to the return stated that petitioner had received $ 21,261.66 in wages, tips and other compensation from SSI. Petitioner and Diana on their joint 1977 individual income tax return reported $ 44,138 in total gross income. The $ 44,138 consisted of $ 40,000 in wage, salary, tips and other employee compensation, $ 20 of interest income, $ 292 of state and local income tax refunds and $ 3,826 of capital gains. The Form W-2 attached to the return stated that petitioner had received $ 40,000 in wage, tips and other compensation from SSI. Petitioner and Diana on their joint 1978 individual income tax return reported $ 27,481 of total gross income. The $ 277,481 consisted of $ 31,200 of wages, salary, tips and other employee compensation, *435 $ 1,291 of interest income, $ 522 of dividend income, $ 4,186 of capital gains and a $ 9,718 partnership loss from the D-Y Properties partnership. The Form W-2 attached to the return stated that petitioner had received $ 31,200 in wages, tips and other compensation from SSI. On the Schedule B attached to the return, petitioner and Diana were shown to have received $ 1,291 of interest income consisting of $ 16 from the IRS, $ 1,230 from the Bank of America and $ 45 from Bell Savings & Loan. Petitioner and Diana on their 1978 return did not report having received any interest income from either the Gopal Properties I partnership or the D-Y Properties partnership. The name of the partnership following petitioner's arrest had been changed from Gopal Properties I to D-Y Properties. On a Schedule E attached to the 1978 return, petitioner and Diana claimed a $ 9,718 partnership loss from D-Y Properties. On his individual income tax returns for the year 1975 through 1978, petitioner listed his occupation as that of "executive engineer" or "executive." Petitioner on his returns for these years did not report any income from the sale of computer trade secrets. SSI on its U.S. Corporation *436 Income tax returns for its taxable years ending May 31, 1976, May 31, 1977, May 31, 1978 and May 31, 1979, reported having the following amounts of gross receipts, cost of goods sold, income, total deductions and taxable income before the taking of a net operating loss deduction: FYE
FYE
FYE
FYE
5/31/76
5/31/77
5/31/78
5/31/79
Gross Recipts
750 130,173 501,045 83,000 Cost of goods sold
(660)
(99,683)
(366,044)
(77,084)
Gross Profit
90 30,535 135,101 5,926 Other Interest Income
12 990 2,728 2,403 Net Capital Gain Income
-- -- 181 19,618 Net Gain or (Loss)
-- -- (37,330)
-- Other Income
-- * 50,000 -- -- Total Income
102 81,525 100,580 27,947 Total Deductions
(61,875)
(91,741)
(101,565)
(37,848)
Taxable Income Before
(61,773)
(10,216)
(985)
(9,901)
Net Operating Loss
Deduction
SSI's corporate income tax returns for its taxable years ending May 31, 1976 through May 31, 1979, disclosed the following information on the compensation of its officers: FYE
FYE
FYE
FYE
5/31/76
5/31/77
5/31/78
5/31/79
Name of Officer
Peter Gopal
Peter Gopal
Peter Gopal
Peter Gopal
Time Devoted to
Full
Full
Full
Full
Business
Percentage of
* 26%
33%
33%
67%
Corporation Stock Owned
Amount of Compensation
$ 31,200
$ 31,200
$ 31,350
None
Total Compensation of
$ 31,200
$ 31,200
$ 31,350
None
Officers
*437 SSI's corporate income tax returns for its taxable years ending May 31, 1976 through May 31, 1979, stated the corporation was engaged in the activity of research electronics. The returns also stated the corporation offered products or services involving electronic components. SSI on its corporate income tax return for its taxable year ending May 31, 1978, stated that the corporation had $ 10,297 of beginning inventory, made purchases of merchandise of $ 355,747 during the year and had no closing inventory. Respondent's Notice of Deficiency
Respondent in his notice of deficiency to petitioner for the year 1978 increased petitioner and Diana's taxable income in the total amount of $ 623,950.27. The notice of deficiency contained the following explanation of the adjustments made: (a) In the absence of adequate records, your taxable income for the taxable year 1978 has been computed by reference to bank deposits and cash payments. Thus, your reported taxable income is increased in the amount of $ 478,904.40, computed as follows: Bank Deposits
California First Bank -- Account Number XXXX-XX2116
$ 350,914.40
California First Bank -- Account Number XXXX-XX1738
2,000.00
$ 352,914.40
Cash Payments:
D-Y Properties partnership capital contribution
$ 125,990.00
Total deposits and cash payments
$ 478,904.40
*438 (b) It is determined that the $ 144,000.00 withdrawn from the Semiconductor Systems International, Inc. bank account and deposited to your California First Bank account, number XXXX-XX3296, is taxable as ordinary income. Since this income was not reported on your return, your taxable income for 1978 is increased by $ 144,000.00. (c) During the taxable year 1978 the interest income that you received from the California First Bank was not reported on your income tax return. Accordingly, your taxable income is increased $ 1,045.87.
The notice also stated it had been determined that all or part of the underpayment of tax for 1978 was due to fraud and that the 50 percent addition to tax for fraud under section 6653(b) was asserted. OPINION This case involves issues as to respondent's adjustments increasing petitioner's taxable income for 1978 and respondent's determination of an addition to tax under section 6653(b). I. Adjustments to Petitioner's Taxable Income A. Bank Deposits and Cash Payments
Where a taxpayer fails to maintain or produce adequate books and records, *439 respondent is authorized by section 446 to compute the taxpayer's taxable income by any method which, in respondent's opinion, clearly reflects income. Holland v. United States,348 U.S. 121, 130-132 (1954); Meneguzzo v. Commissioner,43 T.C. 824, 831 (1965); Sutherland v. Commissioner,32 T.C. 862 (1959). Respondent has great latitude in selecting a method for reconstructing a taxpayer's income and his method need only be reasonable in light of all the surrounding circumstances. This Court has long accepted the bank deposits method of income reconstruction. Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978); Estate of Mason v. Commissioner,64 T.C. 651, 653 (1975), affd. 566 F.2d 2 (6th Cir. 1977). While not conclusive, bank deposits are prima facie evidence of income. Boyett v. Commissioner,204 F.2d 205 (5th Cir. 1953), affg. a Memorandum Opinion of this Court; Hague Estate v. Commissioner,132 F.2d 775 (2d Cir. 1943), affg. 45 B.T.A. 104 (1941). Petitioner thus must show that the deposits had a non-taxable source. It *440 is stipulated that the deposits were not attributable to gifts or inheritances. Petitioner's primary position is that the $ 352,914.40 in deposits to his two California First Ban accounts and the $ 125,990.00 capital contribution to the D-Y Properties partnership were from loans he received from the Swiss company GHF. Petitioner further argues that the evidence presented fails to establish that petitioner derived any unreported income from illegal activities. Petitioner states that "The issue here is not really whether Petitioner earned income from illegal activities. The issue is whether Petitioner earned income in excess of what he reported on his tax return." Contrary to petitioner's assertion, we have found as a fact that for the five-year period ending with his arrest, petitioner engaged in obtaining and selling computer trade secrets and information. Our findings detail petitioner's 1978 sale of information on the Intel 2114 microcomputer chip to Maruman for $ 60,000. Additionally, during the undercover operation, petitioner admitted that he engaged in such activities for at least a five-year period and made many sales of computer trade secrets and information to European *441 customers. Petitioner engaged in an illegal but extremely lucrative business. After examining petitioner's 1975, 1976, 1977 and 1978 individual returns and the corporate returns of SSI, we are convinced the income he actually earned far exceeded the income reported. It has been stipulated that petitioner reported no income from the sales of computer trade secrets on his individual tax returns. Petitioner for the years 1975 through 1978 reported the following amounts of total gross income: Year
Total Gross Income Reported
1975
$  6,484.42
1976
25,115.00
1977
44,138.00
1978
27,481.00
SSI, the company for which petitioner worked full time, on its returns for its fiscal years ending May 31, 1976, through May 31, 1979, reported only losses. Petitioner at Trial testified that the money deposited to his bank accounts was attributable to $ 600,503 in loans from the Swiss company GHF. Petitioner offered various loan documents and cash confirmations. He also offered the testimony of Dr. Karl Zerner, an Austrian lawyer who has represented and was familiar with the affairs of petitioner's associate, Sacher. Dr. Zerner testified that in 1979 *442 the documents existed; that while he had not witnessed the execution of the loan agreements in 1977 and 1978, he actually saw the documents in 1979. In light of petitioner's frequent employment of fictitious invoices in his illegal business, we view this proferred evidence and testimony with considerable skepticism. Petitioner's statements during the undercover operations indicate that he regularly used fictitious invoices. See n.5 at p. 10, supra. We think it more likely, even assuming the actual execution of the loan agreement documents in 1977 and 1978, that the documents were prepared to furnish a cover for petitioner to repatriate his ill-gotten earnings from abroad to the United States. The essential inquiry is whether a valid loan existed between petitioner and GHF. For a bona fide loan to have arisen both parties, at the time the funds were furnished, must have had an actual intent to establish a debtor-creditor relationship. Fisher v. Commissioner,54 T.C. 905 (1970); Haber v. Commissioner,52 T.C. 255 (1969), affd. 422 F.2d 198 (5th Cir. 1970). *443 Whether such a debtor-creditor relationship came into being is a question of fact to be determined upon consideration of all the evidence. Saunders v. Commissioner,720 F.2d 871 (5th Cir. 1983), affg. T.C. Memo. 1982-655; Beaver v. Commissioner,55 T.C. 85, 91 (1970). Based on petitioner's use of fictitious invoices and his subsequent felony conviction, we do not find his testimony credible. [6] Moreover, after considering the other evidence of record, we must reject petitioner's contention that deposits made to his accounts were attributable to bona fide loans. The purported loan agreements required petitioner to pay a minimum annual interest of 18 percent on up to $ 500,000 of the funds advanced. Petitioner was to repay the funds within 60 months upon GHF's demand. GHF did not receive any security for the loan. Petitioner also was to use the funds to invest in U.S. securities and U.S. real estate. The agreement required petitioner to submit annual reports on his investments to GHF, but he never did so. Further, petitioner never offered any details concerning the investments he made. Petitioner acknowledged that the funds have *444 never been repaid, stating that the money was lost through making bad investments and paying the legal expenses of his criminal case. A cash confirmation offered by petitioner states that he received $ 167,239 of the alleged GHF tax return does not indicate sufficient income, loss or deductions commensurate with his receipt and investment of such amount of funds. Petitioner reported no dividends or rental income. He reported only $ 20 of interest income from a Federal tax refund. While he reported $ 3,826 in capital gains, the gain were attributable to stocks acquired prior to the July 13, 1977, date of the alleged loan agreement between petitioner and GHF. Dr. Zerner, petitioner's witness, when asked why GHF waited until 1984 to commence legal proceedings against petitioner to collect the alleged debt, essentially claimed that petitioner would be able to pay the debt if given more time. The intention of the parties relates not so much to what the transaction is called, or even what form it takes as it does to an actual intent that money advanced will be repaid. Berthold v. Commissioner,404 F.2d 119, 122 (6th Cir. 1968), affg. a Memorandum Opinion of this *445 Court; Commissioner v. Makransky,321 F.2d 598, 600-601 (3d Cir. 1963), affg. 36 T.C. 446 (1961). Based on the record before us, we do not accept petitioner's contention that the funds deposited in his bank account and contributed to his partnership were attributable to bona fide loans from the Swiss company GHF. The record does contain evidence that three deposits, each in the amount of $ 4,804.80, to petitioner's California First Bank account, were from loan repayments by the Gopal Properties I partnership on the $ 150,000 loan received from petitioner. While respondent acknowledges that the three deposits were loan repayments, he contends that petitioner has now shown what portion of the payments consisted of principal rather than interest. We disagree. There is additional evidence *446 of record that the payments were made solely on the loan's principal. Petitioner on his 1978 return did not report the receipt of any interest income from the partnership. The partnership's 1978 return also discloses that no interest was paid to petitioner. We are thus satisfied that the three deposits were not income to petitioner, and so hold. Petitioner maintains that respondent's addition of the $ 125,990 partnership contribution to petitioner's income is not valid. Petitioner further complains it is now impossible to ascertain the source of the funds which he contributed to the partnership in 1978. We have, however, in the past sanctioned the use of the bank deposits-cash expenditures method to reconstruct a taxpayer's income. Once respondent in his notice of deficiency has determined that the unexplained deposits and cash expenditures constitute unreported income, the burden of proving respondent's determination erroneous rests with petitioner. Nicholas v. Commissioner,70 T.C. 1057, 1064-1065 (1978); Harper v. Commissioner,54 T.C. 1121, 1129 (1970). *447 We have further carefully examined the record concerning petitioner's contention that the addition of the $ 125,990 capital contribution to petitioner's income is duplicative of bank deposits included in petitioner's income. Petitioner notes a $ 53,263.06 advance to the partnership on October 31, 1978, which came from funds withdrawn from the Yoshikawa account maintained for petitioner. While the $ 53,263.06 is labelled as an advance from petitioner, we are unsure that such amount is part of the $ 125,990 capital contribution petitioner made in 1978. The $ 53,263.06 which the partnership received on October 31, 1978, is listed on the partnership's books as an advance by petitioner, not as an "investor investment." Further upon examining the Yoshikawa account passbook, it appears that significant deposits were made to the account over and above the $ 284,137.13 transferred from petitioner's two California First Bank accounts and the $ 144,000 transferred from SSI's account. We, thus, cannot conclude the capital contribution was attributable to amounts already included in petitioner's income by respondent. Petitioner has advanced no other explanation as to the source of the $ *448 352,914.40 deposited in his bank accounts and to the $ 125,990 contributed to his partnership. He solely claims that the money came from loans from the Swiss company, a contention which we have rejected. We consequently sustain respondent's determination that the deposits, less the three deposits attributable to the partnership's loan repayments discussed above, and the $ 125,990 cash contributions to the partnership, represent unreported income of petitioner for 1978. B. The $ 144,000 Withdrawn from SSI's Account
Respondent in his notice of deficiency determined that the $ 144,000 withdrawn from SSI's bank account and deposited into the account maintained for petitioner by his friend Yoshikawa was taxable to petitioner. Petitioner argues that the $ 144,000 was not income to him because he did not authorize the withdrawal, nor did he receive any economic benefit from the funds. Petitioner also points out that the $ 144,000 cannot be taxed to him as a constructive dividend because SSI had no earnings and profits. See Sections 301(c)(1) and 316; see also Truesdell v. Commissioner,89 T.C. 1280 (1987). In reply, respondent states he is not contending the *449 $ 144,000 was a constructive dividend. Rather, he asserts that the funds were embezzled or taken without the corporation's consent and represents income to petitioner. See James v. United States,366 U.S. 213 (1961); Weir v. Commissioner,283 F.2d 675, 684-685 (6th Cir. 1960), revg. on another issue a Memorandum Opinion of this Court. Petitioner's contention that the funds were withdrawn without petitioner's authorization is not supported by the record. Petitioner had sole signatory authority over SSI's bank account. While petitioner testified that he never authorized the withdrawal, the funds cold have been removed only with his authorization. Further, the $ 144,000 was deposited into the Yoshikawa account maintained by petitioner. We further reject petitioner's claim that he derived no economic benefit from the funds. Petitioner's argument here is apparently based on the fact he sued Yoshikawa for later improperly using some of the monies in the account. The $ 144,000 taken from SSI's account was comingled with other funds of petitioner deposited in the Yoshikawa account. While it is not possible to specifically trace how the $ 144,000 *450 was used, the record is clear that substantial amounts from the Yoshikawa account were used for petitioner's personal benefit. Funds from the account were used to pay petitioner's legal expenses and over $ 156,000 was retransferred from the account to petitioner. In any event, any later misuse of some of the funds by Yoshikawa does not prevent the $ 144,000 from representing income to petitioner. Petitioner has not proved that the funds were diverted with SSI's consent or that he and the company both agreed the amounts withdrawn were a loan. Petitioner, while owning 67 percent of the shares, was not SSI's sole shareholder. Petitioner exercised dominion and control over the misappropriated funds, and we accordingly find the $ 144,000 was income to him for 1978. James v. United States, supra;Weir v. Commissioner, supra.
C. The $ 1,045.87 of Interest Earned on Petitioner's Bank Account
Petitioner in July, 1978, opened an account at California First Ban in his own name. While all of the funds, other than $ 1, were withdrawn by Diana following petitioner's arrest, $ 1,045.87 of interest was earned on the account for 1978. The $ 1,045.87 *451 was subsequently withdrawn on January 23, 1979. Petitioner's contention that the interest on his account was not taxable to him is inexplicable. He contends only that the funds deposited to the account came from loans. A taxpayer's income includes interest earned. Section 61(a)(4). As discussed above, we have rejected petitioner's contention that the funds deposited were attributable to bona fide loans by a Swiss company. We would point out that even assuming for the sake of argument that we accepted this contention, it is inconsistent with petitioner's claim that the $ 1,045.87 of interest is not taxable to him. The funds deposited in the account would have been petitioner's funds. Any interest earned on the account would therefore be income to petitioner. On reply brief, petitioner makes the new argument that GHF, and not he, was the account's beneficial owner. We reject this late argument for the same reasons we have determined there were no valid loans. We find the $ 1,045.87 to be interest income taxable to petitioner for 1978. II. The Section 6653(b) Addition to Tax Respondent determined the addition to tax for fraud under section 6653(b). The final issue *452 presented is whether all or any portion of the underpayment of tax for 1978 was due to fraud within the meaning of section 6653(b). [7] The burden of proving fraud is on respondent. Section 7454(a); Rule 142(b). Fraud is an intentional wrongdoing; the intent required is a specific purpose to evade a tax believed to be owing. McGee v. Commissioner,61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). In order to prove that an underpayment of tax is due to fraud, respondent must prove, by clear and convincing evidence, that the taxpayer had the specific purpose and intent to evade tax. The existence of fraudulent intent can be established by circumstantial evidence and reasonable inferences drawn from the record. Stoltzfus v. United States,398 F.2d 1002, 1005 (3d Cir. 1968). *453 However, the mere suspicion of fraud is insufficient because fraud is not to be imputed or presumed. Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959). In Bradford v. Commissioner,796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601, the Ninth Circuit Court of Appeals gave a non-exclusive list of circumstantial evidence which may give rise to a finding of fraudulent intent. Such "badges of fraud" would include: (1) understatement of income, (2) maintenance of inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of assets and (6) failure to cooperate with tax authorities. The Ninth Circuit in Bradford further stated that the existence of the following facts supported our finding of fraudulent intent: (1) the taxpayer's engaging in an illegal activity, (2) his attempt to conceal such activity, (3) his dealing in cash and (4) his failing to make estimated tax payments. As detailed in our findings, we have found that petitioner was engaged in illegally *454 obtaining and selling computer trade secrets and information. Petitioner, during the undercover operation which led to his arrest and conviction, stated that he had engaged in such activities over a five-year period. He also claimed to have sold the same design and manufacturing process information on the Intel 2114 microcomputer chip in Europe for $ 1.5 million. Additionally, at trial, respondent offered the testimony of Mr. and Mrs. Sam Yoshikawa. Yoshikawa testified that petitioner had stated he was paid in cash by Optron and the dealings were very profitable to him. Both Mr. and Mrs. Yoshikawa testified as to petitioner's sales of computer products and equipment in Europe. Mrs. Yoshikawa further related that on one occasion petitioner had offered her $ 50,000 to take a package to Europe. The Yoshikawas' testimony is corroborated by handwritten entries in a binder which petitioner maintained. These entries reflect payments made by Optron on May 22, 1978, and September 12, 1978, in the respective amounts of $ 161,464 and $ 136,860. An earlier $ 79,439 payment is recorded as having been made by Optron on an unspecified date. The $ 136,860 payment on September 12, 1978, from *455 Optron was not income reported by petitioner's corporation SSI; the company on its return for its fiscal year ended May 31, 1979, reported $ 83,000 in gross receipts. It has been stipulated that petitioner on his 1978 return reported no income from the sales of computer trade secrets. Petitioner clearly understated his 1978 income; on his 1978 return he reported only $ 27,481 of total gross income. [8]
*456 The record is replete with further indicia of petitioner's fraudulent intent. He failed to maintain adequate books and records. He attempted to conceal his income from computer trade secret and information sale by the issuance of fictitious invoices. Petitioner also declined to cooperate with the revenue agent assigned to examine his 1978 return. Finally, in trying to explain the large deposits made to his bank account, petitioner related the dubious tale that the money was from $ 600,503 in loans from a Swiss company. Respondent has met his burden of showing, by clear and convincing evidence, that there was an underpayment and that a portion of it was due to fraud. We find petitioner is liable for an addition to tax under section 6653(b). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to sections of the Internal Revenue Code as applicable for the taxable year in question. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The California appellate court in petitioner's criminal case, People v. Gopal,171 Cal. App. 3d 524, 217 Cal. Rptr. 487, 492↩ (1985), noted that petitioner's activities are to be distinguished from the lawful and accepted industrial practice of "reverse engineering." Reverse engineering involves taking a known product and working backwards to discover the process by which it was developed and manufactured. In the semiconductor industry, it would entail the purchase of a competitor's computer chips, stripping layers, photographing the circuitry of each layer through a microscope, dissecting the chip to discover the actual design layout and then drawing inferences about the technical processes used to make the device. In contrast, obtaining possession of materials generated in the competitor's actual manufacture of the chips would enable another manufacturer to save the time and cost in reverse engineering the chip. Such savings would involve several months' time and perhaps hundreds of thousands of dollars in research and development. 3. The California appellate court's summary of the events leading to petitioner's arrest is contained in People v. Gopal,171 Cal. App. 3d 524, 217 Cal. Rptr. 487↩ (1985). 4. The following is an excerpt of the taped discussion that took place: [Undercover operative]: * * * give me some idea of how you get it, how you're sure that it's Intel. MR. GOPAL: That I'm not prepared to say. MR. DUNLAP: Well, are you getting it from -- I mean is it the Intel proprietary information. MR. GOPAL: Let's say yes, in a roundabout way. MR. DUNLAP: Well, am I going to be able to see Intel on the proprietary document? MR. GOPAL: No. That I won't * * * [Undercover Operative]: * * * Now I guess I'm still not sure how I'm going to know that it's Intel's. Can you give me a bunch of pieces of paper? * * * MR. MOORE: I think Peter -- I don't know whether he wants me to tell you this, just now on your way here, I think he mentioned something like if he shows you * * * the Intel plates that means that's evidence that he has stolen it. * * * MR. MOORE: That's why he would rather sell you everything, but without their name on it. * * * MR. GOPAL: * * * I'll tell you something. About a year ago a couple of people approached me and they had a bag full of money, in this country, were enticing me to show them. Ok. Which I refused to and I was very glad I refused to because for two weeks after I found out that they were Intel's security people. * * * MR. GOPAL: I will never show Intel's documents to anyone period. Not even to my wife. ↩
5. The following is an excerpt of the taped discussion that took place: [Undercover Operative]: Ha, ha, ha, you just want a check? MR. GOPAL: The check's to be made to a company in Hong Kong, to be paid. [Undercover Operative]: I can pay you? MR. GOPAL: You make it to this company. [Undercover Operative]: So I go through you. MR. GOPAL: Well, as far as National is concerned, you're buying the circuit from Hong Kong. [Undercover Operative]: Is that, um, that would have tax ramifications with you * * * [Undercover Operative]: But I think that's -- that's your problem. MR. MOORE: No, you [unintelligible] [Undercover Operative]: Well, we're going to [list the payment in our] MR. GOPAL: Yeah, you have to [Undercover Operative]: accounts payable MR. GOPAL: They need an invoice. MR. MOORE: My Hong Kong company cannot invoice. Based on what? MR. GOPAL: Call it design and consulting. [Undercover Operative]: You're talking about a million and a half dollars. If I give you a check for a million and a half dollars you're going to have to give me an invoice. MR. GOPAL: We'll get it. * * * MR. GOPAL: No, whether it's ten dollars you need an invoice. [Undercover Operative]: Yeah, that's correct. I just, that's right, want * * * to make sure we have an understanding [about this now]. MR. GOPAL: You need an invoice, but that's a very simple problem because we can send two. The way I do it is to have an invoice * * * [unintelligible]. * * * MR. MOORE: * * * juggling it. I'll bet you can juggle the books. MR. MOORE: Exactly [Undercover Operative]: I'm not juggling it. MR. GOPAL: They need an invoice. [Undercover Operative]: Hey, that is on the up and up with me. I don't have any problems at all. You give me * * * the product, and I give you a check * * *. * * * [Undercover Operative]: If you want me to do it illegally, you know, like when I juggle my books then I MR. GOPAL: Oh, no [Undercover Operative]: would expect a nice discount on doing it that way. MR. GOPAL: Do it legitimately. That's the only way to do it. Well, if you can't get your Hong Kong company, I can use my Swiss company, that's no problem, but you need an invoice. ↩
*. Stated to be from consulting fees ↩
*. This apparent discrepancy is not explained. ↩
6. We would note that petitioner in his state criminal case unsuccessfully tried to explain away his statements made during the undercover operation. He characterized the statements as "sales and marketing speeches" and acknowledged them as being simply "falsehoods." See People v. Gopal,171 Cal. App. 3d 524, 217 Cal. Rptr. 487, 493↩ (1985). 7. Section 6653(b) as applicable to the1978 taxable year in issue provides: (b) FRAUD. -- If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added t the tax an amount equal to 50 percent of the underpayment. * * * ↩
8. On the record before us, we do not doubt that petitioner also understated his incom for earlier years. Substantial understatement of income for several successive years is strong evidence of fraudulent intent. Rogers v. Commissioner,111 F.2d 987, 989 (6th Cir. 1940); Conforte v. Commissioner,74 T.C. 1160, 1201 (1980), affd. in part, revd. in part 692 F.2d 587 (9th Cir. 1982). However, bearing in mind that only the year 1978 is before us and that respondent has the burden of establishing by clear and convincing evidence petitioner's liability for the section 6653(b)↩ addition to tax, we do not rely on any understatement for the years prior to 1978 in the holding we reach, although, since petitioner's conduct establishes a pattern of illegal activity related to his income, we would be justified in doing so.