[No. B065104. Second Dist., Div. Two. Jan. 28, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
BORIS PRIBICH, Defendant and Appellant.

## COUNSEL

Jill C. Hatfield for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, Jaime L. Fuster and Sanjay T. Kumar, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BOREN, P. J.**—Boris Pribich appeals after a jury convicted him of one count of the theft of trade secrets (Pen. Code, § 499c, subd. (b)(2)) and found the offense to be a misdemeanor petty theft. The court suspended imposition of sentence, placed appellant on summary probation for three years, ordered him to pay restitution of $400, and stayed payment of a $1,000 fine. Appellant contends that the evidence was insufficient to support his conviction and that there were various jury instruction errors. We find the evidence insufficient as to a requisite element of the offense and reverse.

## FACTS

In April of 1990, Mark Hancock, the executive vice-president of Aquatec, a company which designs and manufactures water coolers, hired appellant, an engineer, to work on a new type of water cooler. Appellant's project was to work on a freonless cooler, Aquatec's New Century water cooler, which would not use fluorocarbons and instead would use a thermal electric chip. Aquatec and Hancock had patents on the methods to use this chip in water coolers. The use of such a thermal electric chip was known, but it had never actually been applied to such a product. At Hancock's request, appellant drafted a schedule, setting forth the time frame within which he could accomplish the project. Appellant initially advised Hancock that he was working on schedule, but appellant increasingly fell behind schedule. Hancock talked to appellant about his performance and advised him that the company wanted to introduce this particular product at an October trade show.

Hancock acknowledged that some people found appellant "eccentric," but he realized that appellant was intelligent and wanted to give him the opportunity to demonstrate his capabilities. Hancock gave appellant a staff to assist him on his project, gave appellant his own work space within the engineering department, and also permitted appellant to work at home on his own home computer.

Hancock was familiar with some of the information in appellant's computer at work, such as graphs and equations on the performance of thermal electric chips. This information was necessary to Aquatec's objective of improving the performance of the thermal electric chip. Hancock thus considered the information in appellant's computer at work to constitute trade secrets belonging to Aquatec, since the information dealt with Aquatec's product and was not available to the general public.

To protect such trade secrets, Aquatec did not allow nonemployees to go into the building without being escorted and required employees to sign a confidentiality agreement. Even the sales people employed at Aquatec who had confidentiality agreements with the company were not permitted to view appellant's work product because, as Hancock stated, "We didn't want our competitors tipped off, we did not want the people to know what we were working on. And Aquatec is a start up company and could easily be outdone by someone with a large amount of cash and no one was going in our engineering department without a confidential[ity] agreement." According to Hancock, the information in appellant's work computer "would be of great interest . . . to our competitors."

Appellant was repeatedly absent from work, fell behind schedule, and Hancock became increasingly concerned that appellant could not finish his project to enable Aquatec to have an operating unit of its new product to demonstrate at the trade show in October of 1990. On September 17 and 19, 1990, Hancock asked appellant to have all the documents he had on his project available at the plant and to bring all the Aquatec documents and computer files or programs that he had at home to the plant. On September 20, Hancock asked appellant whether he brought all the information that had been requested and reminded appellant of the confidentiality agreement that he had signed. Appellant advised Hancock that the computer program was his property and stated, "You are a prick, I can be a prick, too." Hancock requested appellant to go to his work area and show another employee, Yongky Muljadi, what he was doing on the computer so that Muljadi could be brought up to date on appellant's project.

Hancock then called the company's patent counsel to alert him of the events. Appellant was very upset at that time. He showed Muljadi the files on the computer screen and claimed they belonged to him. However, based on the code letters of the files, Muljadi concluded that some of them were not appellant's files. Appellant proceeded to delete the files he claimed were his. After deleting the files, appellant left the building and never came back to work.

Hancock thereafter hired a computer consultant, Robert Torchon, to retrieve the data in appellant's work computer. Torchon and Muljadi were unable to retrieve the data. Hancock then contacted appellant and demanded that all the computer files and programs and other materials be returned to Aquatec. Appellant refused to do so, unless Aquatec paid a fair or reasonable price for them. Aquatec did not produce for the October trade show any prototype of a water cooler using a thermal electric chip.

On October 12, 1990, a Los Angeles police officer served a search warrant at appellant's residence. The police found two computers, computer discs, programs and numerous papers. The police officer who served the warrant used a Turbo Basic program to obtain computer printouts generated from diskettes found in appellant's house. Most of the computer files found in appellant's house had "BAS" or "DWG" extension code letters, such as the code letters observed by Muljadi on the screen of appellant's work computer before appellant deleted the files.

According to Hancock, some of the documents obtained from appellant's home pertained to the work appellant was doing for Aquatec, constituted drawings of certain components that go into the coolers and certain information on the thermal electric cooler, and were deemed by Hancock to be

proprietary documents or trade secrets of Aquatec. The documents included information about a heat exchanger, a heat problem in the thermal electric chip, and a bottle cap designed by Aquatec. A computer printout and computer programs, calculations, tests and graphs regarding the performance of Aquatec's new cooler were also discovered pursuant to the search warrant. Appellant was not supposed to have retained those items seized and should have returned them to Aquatec as Hancock had requested.

In appellant's defense at trial, Dr. Martin Balaban, a mechanical engineer employed by Union Carbide to design heat exchangers and a consultant for the Rand Corp., testified that none of the prosecution's documentary evidence obtained from appellant's computer at home included any original concepts which could have given Aquatec an advantage over competitors who did not know of those documents. Moreover, the prosecution evidence included a document which showed appellant's coefficient of performance for a week when he was sick, another document constituting a milestone chart in which appellant outlined his project schedule, and other documents reflecting concepts which were in the public domain, though the exact numbers and dimensions set forth in the documents were not generally available to the public. According to Balaban, based upon his professional engineering expertise, it is not possible to make a thermal electric water cooler for the home or office which would be energy efficient and marketable.

Appellant claimed that he did not erase the files at work which belonged to Aquatec. As a part of his employment with Aquatec, he was required to use two computer programs, Auto Cad and Turbo Basic. Before he left Aquatec, appellant removed his Turbo Basic program, of which he was the registered owner, and a game-type program which he had in his work computer. He removed the programs in Muljadi's presence. When Hancock contacted appellant at home and demanded the program which he had taken, appellant claimed that he owned the programs and he never offered to sell them to Hancock. Appellant merely offered to convert his files into stand alone files, which could be used without the Turbo Basic program. Appellant admitted that most of the documents seized by the police at his home dealt with Aquatec's New Century water cooler project.

The jury found appellant not guilty of one of the two charged offenses, the unauthorized deletion of computer data. (Pen. Code, § 502, subd. (c)(4).)

However, appellant was found guilty of the theft of trade secrets as a misdemeanor.[1] (Pen. Code, § 499c, subd. (b)(2).)

## DISCUSSION

To satisfy the elements of the crime with which appellant was charged, the fraudulent appropriation of an article representing a trade secret entrusted to him (Pen. Code, § 499c, subd. (b)(2)), the prosecution must, of course, establish that the article appropriated represented a trade secret. Penal Code section 499c, subdivision (a)(9) defines a trade secret, in pertinent part, as "any scientific or technical information, design, process, procedure, formula, computer program or information stored in a computer . . . which is secret and is not generally available to the public, and which gives one who uses it an advantage over competitors who do not know of or use the trade secret; and a trade secret shall be presumed to be secret when the owner thereof takes measures to prevent it from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."  ▇  One of the requisite elements of a trade secret is lacking in the present case. Specifically, there is no evidence that any of the items allegedly fraudulently appropriated by appellant and retrieved from his computer at home would give "one who uses [any of the items] an advantage over competitors who do not know of or use the trade secret." (Pen. Code, § 499c, subd. (a)(9).)

In the present case, Hancock testified that he was familiar with some of the information in appellant's computer at work, which included graphs and mathematical models relating to the performance of thermal electric chips, that he considered the items observed on appellant's computer at work as trade secrets and that the items in appellant's computer at work would be of "great interest" to a competitor. However, Hancock described the information in appellant's computer at work and not in his computer at home. It was the information in appellant's computer at home which had been appropriated and which was alleged to constitute trade secrets. Although Hancock indicated that a computer printout reflecting information retrieved from appellant's computer at home contained a proprietary or trade secret of Aquatec, he stated only that "a lot of it is very familiar" and "looks like material that I saw on the screen that [appellant] was working on and certain other graphs I have certainly seen." However, Hancock could not indicate

---

[1]As the prosecutor indicated during closing argument, he had neglected during trial to introduce any evidence that the value of the information appropriated by appellant was in excess of $400. Although the prosecutor urged the jury to assume the value was greater than $400 and that the offense was a felony, the jury apparently, and quite properly, declined to indulge in such an assumption, which was not supported by any evidence.

"the exact coding" for the printout. Such testimony by Hancock insufficiently addresses the items purportedly fraudulently appropriated by appellant, i.e., the numerous items generated from appellant's computer at home.

Most significantly, Hancock did not establish that the items seized from appellant's computer at home could give "one who uses it an advantage over competitors." (Pen. Code, § 499c, subd. (a)(9).) Hancock did indicate that one of the items retrieved from appellant's computer was a milestone chart or work schedule which was not a technical document but which he considered proprietary to Aquatec. Hancock would not have wanted anyone to know appellant's work schedule because it would have revealed where Aquatec was at any point in time regarding its product development. However, Hancock did not specifically allege any advantage a competitor could obtain by theoretical access to such information. For example, there was no indication that any unspecified company could or would have worked any faster or differently if it had access to appellant's work schedule.

The "advantage over competitors" requirement for the theft of trade secrets (Pen. Code, § 499c, subd. (a)(9)) is somewhat analogous to a provision in the federal Freedom of Information Act (5 U.S.C. § 552) which exempts from public disclosure trade secrets (see 18 U.S.C. § 1905) and, in pertinent part, "commercial" information which is "confidential." (5 U.S.C. § 552(b)(4).) Federal case law interpreting whether the information sought to be disclosed is "confidential" requires that the information in question either be likely to impair the government's ability to obtain necessary information in the future or, more pertinent to the present case, to cause substantial harm to the competitive position of the person from whom the information was obtained. (See, e.g., *Sharyland Water Supply Corp.* v. *Block* (5th Cir. 1985) 755 F.2d 397, 399, cert. denied 471 U.S. 1137 [86 L.Ed.2d 697, 105 S.Ct. 2678]; *Public Citizen Health Research Group* v. *F.D.A.* (D.C. Cir. 1983) 704 F.2d 1280, 1290-1291 [277 App.D.C. 151]; *Miami Herald Pub. Co.* v. *U.S. Small Bus. Admin.* (5th Cir. 1982) 670 F.2d 610, 613-614.) "To prove substantial competitive harm, the party seeking to prevent disclosure must show by specific factual or evidentiary material, not conclusory or generalized allegations, that it actually faces competition and that substantial competitive injury would likely result from disclosure." (*Sharyland Water Supply Corp.* v. *Block, supra,* 755 F.2d at p. 399, fns. omitted.)

Apart from whether a "substantial" competitive advantage is required for a violation of Penal Code section 499c, we find that the element of the offense that the prosecution establish the item appropriated give "one who uses it an advantage over competitors who do not know of or use the trade secret" requires more than merely conclusory and generalized allegations.

Hancock asserted that the information in appellant's computer at work would be of "great interest" to a competitor and stated his desire not to have any competitors know appellant's work schedule, which was in appellant's computer at home. However, such statements do not reveal, except by an insufficient and generalized assumption, that any competitive advantage would specifically flow from the revelation of the information.

Indeed, it appears most unlikely that any competitive advantage could have been obtained by knowledge of appellant's work schedule or other information because, as indicated by the uncontradicted testimony of appellant's expert witness, it was impossible in light of known scientific principles to make a thermal electric water cooler for the home or office which would be energy efficient and marketable. Hancock himself acknowledged that one of the items retrieved from appellant's computer revealed appellant's opinion that the model under study was not suited for low-cost thermal electric modes and "was not working very well." Moreover, appellant's expert witness repeatedly stated during direct and cross-examination that none of the documents obtained from appellant's computer at home would give anyone who had them any advantage over competitors.

We note that in the prosecutor's argument to the jury, he belittled the defense expert's testimony regarding the lack of any advantage over competitors and urged that it was unrealistic to believe that no competitive advantage could ensue from the information, but the prosecutor pointed to no evidence at trial supporting this conclusion. Nor can we find in the record any substantial evidence as to this element of the offense.

### DISPOSITION

The judgment is reversed, and the trial court is directed to dismiss the information and to order any restitution and fine paid by appellant be remitted to him.

Fukuto, J., and Nott J., concurred.