103 Cal.Rptr.2d 51 (2001)
86 Cal.App.4th 287
The PEOPLE, Plaintiff and Respondent,
v.
Chung-Ta HSIEH, Defendant and Appellant.
No. H019958.
Court of Appeal, Sixth District.
December 15, 2000.
Ordered Not Officially Published February 28, 2001.[*]
*53 Frank R. Ubhaus, William E. Adams, Jamie L.B. Braga, Berliner Cohen, San Jose, for Defendant and Appellant.
Bill Lockyer, Attorney General, David Druliner, Chief Asst. Atty. General, Ronald A. Bass, Senior Asst. Atty. General, Ronald E. Niver, Supervising Deputy Atty. General, Clifford K. Thompson, Juliet B. Haley, Deputy Atty. General, for Plaintiff and Respondent.
*52 WUNDERLICH, J.
Following a court trial, defendant was convicted of one count of misappropriating a trade secret in violation of Penal Code *54 section 499c.[1] The court reduced the conviction to a misdemeanor. (§ 17.) The court found defendant not guilty of two other charges: felony deletion of computer data (§ 502, subd. (c)(4)) and grand theft of a microwave modular switch. (§§ 484/487.) Defendant appeals the judgment of conviction under section 499c on the ground of insufficiency of the evidence. We will reverse.

FACTS
Defendant Chung-Ta Hsieh is an engineer. In 1996, he was hired by Anritsu Microwave Measurement Division (formerly Wiltron), a Morgan Hill company that produces test equipment for sale to the communications industry ("Anritsu"). At the time defendant began working for Anritsu, the company was developing a product it called the 69000b Synthesizer. The 69000b Synthesizer was designed to convert a fixed frequency signal to a flexible, broad-band source, thereby allowing customers to test many different devices with a single instrument. The 69000b Synthesizer incorporated an IQ modulator, on which defendant worked.[2]
Eventually, defendant became dissatisfied with his employment at Anritsu. In the spring of 1997, he complained to his supervisor Eric Liu ("Liu") that his compensation was inadequate and his talent was being underutilized. Defendant also sought relief from the obligation to repay a $25,000 moving allowance that Anritsu had advanced. Negotiations proved unsuccessful in resolving the parties' differences, and the situation deteriorated further. In April 1997, Liu gave defendant a verbal warning about his work performance, followed several days later by a written warning. Defendant's employment was terminated on April 29, 1997.

PROCEDURAL HISTORY
In May 1997, law enforcement officers executed a search warrant on defendant's residence while he was away. During the search, the officers seized evidence, including a crumpled paper containing a handwritten engineering diagram, which they retrieved from the wastebasket in defendant's living room. The paper contained a simplified block diagram of the IQ modulator.
Five months later, the Santa Clara County District Attorney's Office filed a three-count felony complaint against defendant. Count one alleged grand theft of trade secrets in violation of section 499c. Counts two and three charged defendant with altering a computer system for illegal use in violation of section 502, subdivision (c)(4), and of grand theft of a microwave modular switch in violation of sections 484 and 487, subdivision (a). In March 1998, defendant was charged by information with the same violations enumerated in the complaint.
Defendant waived a jury. Court trial began January 21, 1999, and concluded on January 28, 1999. The court acquitted defendant of the second and third counts of the information, but convicted him of the first count, grand theft of a trade secret in violation of section 499c.[3] The *55 court reduced the conviction to a misdemeanor. (§ 17.) In March 1999, the trial judge sentenced defendant to six months in the county jail, then stayed the sentence on condition that defendant complete 50 hours of uncompensated community service within one year. The court also placed defendant on supervised probation for three years.
Following sentencing, defendant filed this timely appeal.

STANDARD OF REVIEW
Because defendant challenges the evidentiary support for his conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (People v. Johnson (1980) 26 Cal.3d 557, 562, 575-579, 162 Cal.Rptr. 431, 606 P.2d 738.) We view the evidence "in the light most favorable to the prosecution." (Jackson v. Virginia (1979) 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.) "The court does not, however, limit its review to the evidence favorable to the respondent." (People v. Johnson, supra, 26 Cal.3d at p. 577, 162 Cal. Rptr. 431, 606 P.2d 738.) Rather, we examine the entire record to determine whether the evidence on each essential point is substantial. (Ibid.)

DISCUSSION
In analyzing whether a reasonable trier of fact could have convicted defendant of trade secret theft, we test the evidence in the record against the elements of the statute. By statutory definition, a trade secret must derive economic value from its secrecy, and it must be the subject of reasonable measures to protect it. (§ 499c, subd. (a)(9)(A), (B). See also, Civ.Code, § 3426.1, subd. (d)(1), (2).)[4] Theft of a trade secret requires both intent and an act of misappropriation. (§ 499c, subd. (b)(1); compare, Civ.Code, § 3426.1, subd. (b).) It is the prosecution's burden to establish each element of the crime beyond a reasonable doubt. (Jackson v. Virginia, supra, 443 U.S. at p. 316, 99 S.Ct. 2781. See, 1 LaFave & Scott, Substantive Criminal Law (1986) § 1.8(b), p. 68.) Proof of each element "requires more than mere conclusory and generalized allegations." (People v. Pribich (1994) 21 Cal. App.4th 1844, 1850, 27 Cal.Rptr.2d 113.) As we explain below, insufficient evidence *56 as to some elements of the crime compels us to reverse defendant's conviction.

1. Trade Secret Status.
Obviously, a threshold requirement for conviction under section 499c is that the theft must involve a trade secret. (People v. Pribich, supra, 21 Cal.App.4th at p. 1849, 27 Cal.Rptr.2d 113.) To constitute a trade secret, the information must derive its value from not being generally known. (§ 499c, subd. (a)(9).) Furthermore, the owner of the information must undertake reasonable efforts to keep it secret. (Ibid.) To assess whether the hand-drawn diagram admitted at trial as Exhibit 2A is a trade secret, we examine each element of the statutory definition in turn.

a. Was the information generally known?
Under the statute, as at common law, there is no trade secret protection for information known either to the public at large or to those skilled in the particular field. (Vacco Industries, Inc. v. Van Den Berg (1992) 5 Cal.App.4th 34, 50, 6 Cal. Rptr.2d 602 [interpreting Civ.Code, § 3426.1, which incorporates the identical definition of trade secret].) "The subject of a trade secret must be secret, and must not be of public knowledge or of a general knowledge in the trade or business. [Citations.]" (Kewanee Oil Co. v. Bicron Corp. (1974) 416 U.S. 470, 475, 94 S.Ct. 1879, 40 L.Ed.2d 315.) Thus, where a company's general approach was "dictated by well known principles of physics," it was "not protectible under accepted trade secret doctrine. It was not `secret,' for it consisted essentially of general engineering principles in the public domain and part of the intellectual equipment of technical employees." (Winston Research Corp. v. Minnesota Min. & Mfg. Co. (1965) 350 F.2d 134, 139. Accord, Futurecraft Corp. v. Clary Corp. (1962) 205 Cal.App.2d 279, 281, fn. 1, 23 Cal.Rptr. 198.)
In this case, both the prosecution and the defense offered evidence about whether the information contained on People's Exhibit 2A was generally known. In cursory fashion, Liu testified for the prosecution that Exhibit 2A was secret. His direct testimony on that point, in its entirety, is as follows:
"Q. Is that design considered proprietary by Wiltron, its property?
A. Yes.
Q. Is it something the company keeps secret, this design, from its competitors and others?
A. Yes."
On cross-examination, Liu expanded on his earlier testimony that the information was proprietary by adding: "It's a selection of the 4 gigahertz." But Liu conceded that the figure of 4 gigahertz came from the outside vendor of the IQ modulator. Liu also conceded that defendant came up with the rest of the values on the diagram.
For his part, defendant testified that the basic design contained in Exhibit 2A was a common receiver system, which had been in use in the industry since World War II, and which he found in an engineering text available in a bookstore.[5] *57 He acknowledged, however, that the frequency values or parameters on the diagram were those developed while he was at Anritsu.[6]
Even assuming that the trial court properly rejected defendant's evidence that the design was commonly known to engineers, we are troubled by the prosecution's scant testimony on this point. (See, People v. Pribich, supra, 21 Cal.App.4th at pp. 1850-1851, 27 Cal.Rptr.2d 113, reversing a conviction under section 499c for lack of substantial evidence, where the testimony consisted of "conclusory and generalized" statements.) The People argue that Pribich is inapposite because it construed the predecessor statute.[7] We respectfully disagree. While it is true that Pribich interpreted a portion of section 499c that has since been amended, the fundamental premise of that case is sound: proof of an essential element of a crime "requires more than merely conclusory and generalized allegations." (Id. at p. 1850, 27 Cal. Rptr.2d 113.)
The People also seek to distinguish Pribich, arguing that the record in this case, unlike Pribich, contains evidence that the company derived economic value "from exclusive control of the information revealed in Exhibit 2A." We consider that issue now.

b. Did the information derive economic value from secrecy?
To constitute a trade secret, information must have actual or potential economic value that derives from its secrecy. (§ 499c, subd. (a)(9)(A).) Relevant considerations in proving value include "`the savings effected and the value to the holder in having the information as against competitors; [ ] the amount of effort or money expended in obtaining and developing the information; and [ ] the amount of time and expense it would take for others to acquire and duplicate the information.' [Citations.]" (State ex rel. Besser v. Ohio State Univ. (2000) 89 Ohio St.3d 396, 399-400, 732 N.E.2d 373, 378.) But it is not enough that the information have value; under the current statute, actual or potential economic value must derive from the fact that the information is secret. Thus, "a showing of value, by itself, is not sufficient to satisfy the statutory definition.... [T]he statute also requires that the information have value to other businesses which are unaware of the information and which could put that information, if known, to beneficial use." (ABBA Rubber Co. v. Seaquist, supra, 235 Cal.App.3d at p. 19, 286 Cal.Rptr. 518.)
In this case, there was conflicting testimony about the value of circuit design files in general. There was also testimony about the development costs Anritsu incurred in its attempts to bring the 69000b Synthesizer to market. The People contend that those costs constitute circumstantial evidence of the value of the end product and, therefore, of IQ modulator component. (Cf., People v. Gopal (1985) 171 Cal.App.3d 524, 539, 217 Cal.Rptr. 487.) But the critical inquiry is whether the particular design represented by the hand-drawn diagram had actual or potential value to Anritsu because of its secrecy. (ABBA Rubber Co. v. Seaquist, supra, 235 Cal.App.3d at pp. 18-19, 286 Cal.Rptr. *58 518.) The only direct evidence on this point is Liu's testimony.[8] We set it out in full here:
"Q. Is it something that the companythat has value to the company because it is secret because competitors don't know about it?
A. Yes.
[Defense objection overruled.]
Q. Why don't you make this public or block diagrams of this type, People's 2A, public?
A. It's a computation, information. Normally we don't make that public to anybody else.
Q. Does the company derive benefit from its secrecy?
A. Yes."
We have the same difficulty with Liu's testimony regarding value that we have with his testimony about secrecy: it states the ultimate fact without any supporting details. The record is devoid of any foundational facts to support Liu's conclusion that Anritsu derived value from Exhibit 2A by keeping it secret.
We recognize, of course, that "`[t]he opinion of an owner of personal property is in itself competent evidence of the value of that property, and sufficient to support a judgment based on that value. [Citations.] The credit and weight to be given such evidence and its effect ... is for the trier of fact. [Citations.]' [Citation.]" (Resort Video, Ltd. v. Laser Video, Inc. (1995) 35 Cal.App.4th 1679, 1700, 42 Cal.Rptr.2d 136; cf. Evid.Code, § 813, subd.(a)(2).) In this case, however, neither Liu nor any other witness assigned any particular value to the information. While it may be difficult to value a component of a product that has not yet been marketed, conclusory statements of "potential, independent economic value" are not enough to establish a trade secret in either a civil or a criminal case. (State ex rel. Besser v. Ohio State Univ., supra, 732 N.E.2d at p. 379; People v. Pribich, supra, 21 Cal. App.4th at p. 1850, 27 Cal.Rptr.2d 113.)
In People v. Pribich, supra, 21 Cal. App.4th 1844, 27 Cal.Rptr.2d 113, the defendant was convicted of trade secret theft for possessing a work schedule belonging to his former employer, Aquatec. At trial, a prosecution witness testified that the company would not want the schedule divulged "because it would have revealed where Aquatec was at any point in time regarding its product development." (Id. at p. 1850, 27 Cal.Rptr.2d 113.) As the court of appeal noted, however, the witness "did not specifically allege any advantage a competitor could obtain by theoretical access to such information. For example, there was no indication that any unspecified company could or would have worked any faster or differently if it had access to appellant's work schedule." (Ibid.) Testimony that the information "would be of `great interest' to a competitor," and evidence of the company's "desire not to have any competitors know appellant's work schedule, ... do not reveal, except by an insufficient and generalized assumption, that any competitive advantage would specifically flow from the revelation of the information." (Id. at p. 1851, 27 Cal. Rptr.2d 113.)
In this case, too, Liu's testimony can be fairly characterized as "an insufficient and generalized assumption" of the ultimate conclusion of an unassigned and unsupported value. We find that testimony insufficient to prove beyond a reasonable doubt that the diagram derived value from secrecy, a necessary element of trade secret status.

*59 c. Did the company use reasonable efforts to maintain secrecy?
"[A] trade secret is protectible only so long as it is kept secret by the party creating it." (Vacco Industries, Inc. v. Van Den Berg, supra, 5 Cal.App.4th at p. 50, 6 Cal.Rptr.2d 602. Accord, Pillsbury, Madison & Sutro v. Schectman (1997) 55 Cal.App.4th 1279, 1287, 64 Cal. Rptr.2d 698.) "[Reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on `need to know basis,' and controlling plant access.... [H] The efforts required to maintain secrecy are those `reasonable under the circumstances.' The courts do not require that extreme and unduly expensive procedures be taken to protect trade secrets against flagrant industrial espionage. [Citation.]" (Legis. Com. com., 12A West's Ann. Civ.Code, supra, § 3426.1, p. 239.)
Examples of adequate security measures abound in the reported decisions. (See, e.g., People v. Gopal, supra, 171 Cal.App.3d at pp. 537-539, 217 Cal. Rptr. 487; People v. Serrata (1976) 62 Cal.App.3d 9, 23, 133 Cal.Rptr. 144; Religious Technology Center v. Netcom On-Line Communication Services, Inc. (N.D.Cal.1995) 923 F.Supp. 1231, 1253-1254; MAI Systems Corp. v. Peak Computer, Inc. (9th Cir.1993) 991 F.2d 511, 521. Compare, Buffets, Inc. v. Klinke (9th Cir. 1996) 73 F.3d 965, 969.) Whether secrecy measures are sufficient is a factual question for the trial court. (People v. Gopal, supra, 171 Cal.App.3d at pp. 538-539, 217 Cal.Rptr. 487.)
In this case, there was ample evidence that the company undertook reasonable general security measures at its workplace; however, with respect to safeguards for the circuit design files in particular, the evidence is less compelling.[9] Nevertheless, on this record, we cannot say that the evidence is insufficient to support the trial court's implicit finding that reasonable measures were taken to protect the secrecy of the information contained in its design files.

2. Misappropriation.
In considering whether theft was proven, we again begin with the statute. As applicable to this case, it provides: "(b) Every person is guilty of theft who, with intent to deprive or withhold the control of a trade secret from its owner, or with an intent to appropriate a trade secret to his or her own use or to the use of another, does any of the following: [¶] (1) Steals, takes, carries away, or uses without authorization, a trade secret." (§ 499c, subd. (b)(1).)

a. Did the People prove intent?
"Penal Code section 20 states that in every crime there must exist a union or joint operation of act, intent, or criminal negligence." (People v. Peabody (1975) 46 Cal.App.3d 43, 46, 119 Cal.Rptr. 780, italics omitted.) The People bear the burden of proving intent. (Cf., In re Jorge M. (2000) 23 Cal.4th 866, 98 Cal.Rptr.2d 466, 4 P.3d 297 [scienter required, even though statute is silent]; People v. Simon (1995) 9 Cal.4th 493, 516, 37 Cal.Rptr.2d 278, 886 P.2d 1271 [same].) "Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury." (Morissette v. United States (1952) 342 U.S. 246, 274, 72 S.Ct. 240, 96 L.Ed. 288, *60 cited in Sandstrom v. Montana (1979) 442 U.S. 510, 521-522, 99 S.Ct. 2450, 61 L.Ed.2d 39.)
In this case, the prosecution was required to prove that defendant intended "to appropriate a trade secret to his ... own use or to the use of another ...." (§ 499c, subd. (b).) In our view, the crime of trade secret theft requires specific intent. In that respect, we find trade secret theft similar to other kinds of theft, which by judicial interpretation involve "the specific intent to permanently deprive the owner of its property." (People v. Miller (2000) 81 Cal.App.4th 1427, 1446, 97 Cal. Rptr.2d 684.) "`The taking must be with the specific intent to steal, i.e., to appropriate property of another and permanently deprive him of its possession.... [Citations.]'" (People v. Turner (1968) 267 Cal. App.2d 440, 443, 73 Cal.Rptr. 263, original italics.)
In considering the specific intent necessary for a misappropriation for use under section 499c, we must consider the purpose of the statute. Section 499c was enacted out of legislative concern about industrial espionage. (People v. Gopal, supra, 171 Cal.App.3d at p. 541, 217 Cal.Rptr. 487.) The statute is designed to protect the actual or potential economic value of commercial secrets. We thus conclude that the proscribed criminal intent is to deprive the owner of the trade secret's value, whether for personal gain or competitive advantage. (Cf., Religious Technology Center v. Netcom On-Line Com., supra, 923 F.Supp. at p. 1253; Smithfield Ham and Products Co. v. Portion Pac (E.D.Va.1995) 905 F.Supp. 346, 350.)
Furthermore, proof of the requisite specific criminal intent necessarily requires evidence that defendant understood the nature of the information as a trade secret. In a case recently before this court, a software design engineer left his employment, taking with him intellectual property that his former employer claimed as its trade secret. (Ensoniq Corp. v. Superior Court (1998) 65 Cal.App.4th 1537, 77 Cal.Rptr.2d 507.) Upon learning that the employee acted on the advice of counsel in taking the intellectual property, the deputy district attorney declined to prosecute for trade secret theft, concluding that there was "`insufficient evidence to convince a jury beyond a reasonable doubt that [the employee] acted with the required criminal intent.'" (Id. at p. 1544, 77 Cal.Rptr.2d 507.) In this case, of course, defendant made no effort to disprove intent by showing that he acted on advice of counsel; nevertheless, it remains the People's burden to establish that defendant appreciated the nature of Exhibit 2A as Anritsu's trade secret. The California Supreme Court recently decided a case in which a minor was prosecuted for possession of a weapon in violation of the Assault Weapons Control Act (AWCA). There, our high court held that "the People bear the burden of proving the defendant knew or reasonably should have known the firearm possessed the characteristics bringing it within the AWCA." (In re Jorge M., supra, 23 Cal.4th at p. 887, 98 Cal.Rptr.2d 466, 4 P.3d 297, original italics, fn. omitted.) As the court explained, "[a]t issue here, however, is defendant's awareness of the characteristics of a possessed item rather than his awareness of the harmful consequences of an action." (Id. at p. 887, fn. 11, 98 Cal.Rptr.2d 466, 4 P.3d 297 [finding the requisite mens rea]; see also, People v. Winston (1956) 46 Cal.2d 151, 158, 293 P.2d 40 ["While specific intent to violate the law is immaterial to a conviction for the unlawful possession of a narcotic, knowledge of the object's narcotic characterthat is `knowledge that the facts exist which bring the act ... within the provisions of [the] code'is required. [Citations.]"].)
In the case before us, the evidence fails to demonstrate that defendant knew or should have known that the diagram constituted a trade secret. On this point, the record includes the testimony of investigator McMullen, who interviewed defendant *61 after the search and confronted him with the items seized at his home. At trial, McMullen recalled defendant's statement that Exhibit 2A was not proprietary and not a big deal.[10] Defendant also testified about Exhibit 2 at trial, characterizing it as an example of a common design that could be found in an introductory engineering text. Defendant further testified, without contradiction, that he told Liu the design was "nothing new" and could not be patented. Defendant also referred to other design files as electronic scratch paper. The People offered no direct evidence that defendant believed the diagram was a trade secret; nor does the record contain any circumstantial evidence from which to infer defendant's appreciation that the information was a trade secret, apart from the general security measures in place at the company. We find the evidence of defendant's intent to misappropriate a trade secret insufficient to sustain his conviction.

b. Did the People prove defendant's "use" of the trade secret?
In addition to establishing intent, the People must also prove the act of misappropriation beyond a reasonable doubt. The statute punishes one who "[s]teals, takes, carries away, or uses without authorization, a trade secret." (§ 499c, subd. (b)(1).) Here, defendant was accused of using the information in the diagram without authorization.
Again, as with intent, evidence that defendant used the information came in solely through his own testimony and that of investigator McMullen. The investigator testified to defendant's admission that he drew Exhibit 2A for a job presentation but conceded defendant's further statement that he had decided against using the diagram for that purpose. In his own trial testimony, defendant admitted that he drew the diagram to use during a job interview as an example of a simple circuit design. Viewing the record in the light most favorable to the prosecution, it further appears that defendant admitted to actually using the diagram during that job interview.[11] Defendant's job interview was with a company called Thermatrax, which is not Anritsu's competitor.
At most, then, the evidence shows that defendant used the diagram in an interview with a company that did not compete with his former employer. At trial, even the prosecutor conceded that the misappropriation at issue in this case was not the typical unfair competition violation. Nevertheless, he urged the trial court to adopt the broadest statutory interpretation of "use" of the trade secret.
On appeal, the People do not directly urge a broad definition of misappropriation by use. Instead, they simply rely on defendant's testimony that he did use the diagram in a job interview. But we cannot ignore that under the unique facts of this case, defendant's conviction extends the reach of the penal statute beyond traditional notions of trade secret misappropriation. According to the Legislative Counsel, "[t]he following statement would be consistent with S.B. No. 69, which added this section [499c] in 1967: `It is intended that the bill not apply to the mobile employee who retains in his mind information and knowledge acquired while in the employ of one employer and uses or gives it in service of a later employer. *62 The intent is to promote the proper development of scientific and technical trade secrets while at the same time avoiding undue restrictions on the availability of information for which persons in the course of their personal experience have developed or acquired. Thus copies of articles representing trade secrets which are not made at the time that there is access to the article by reason of occupying a position of trust and confidence are not intended to be with the scope of the operation of S.B. No. 69.' (Op.Leg.Counsel, 1967 A.J.1997, 1967 S.J. 1328.)" (48A West's Ann. Pen.Code (1999 ed.) § 499c, p. 608.) The People argue that this opinion has no continuing vitality in light of subsequent statutory amendments, and they further contend that the result it suggests is absurd. We respectfully disagree, particularly as it applies here. In this case, there is only the most meager evidence that defendant used the information at all, and no suggestion whatsoever that he put the information into the hands of a competitor for personal gain. Even in civil cases, trade secret law is not designed to preclude an employee's "use of knowledge, a good deal of which certainly is his own or belongs to the public domain, gained by him through his own industry and intellectual faculties, independently of any association with [his employer], and inextricably interlaced with any knowledge he may have acquired through his employment...." (Futurecraft Corp. v. Clary Corp., supra, 205 Cal. App.2d at p. 281, fn. 1, 23 Cal.Rptr. 198, italics omitted. Compare, Morlife, Inc. v. Perry (1997) 56 Cal.App.4th 1514, 1523, 1525-1527, 66 Cal.Rptr.2d 731.) And "to constitute a criminal act the defendant's conduct must go beyond that required for civil liability.... [Citations.]" (People v. Peabody, supra, 46 Cal.App.3d at p. 47, 119 Cal.Rptr. 780 [criminal negligence statutes].)
For all of the foregoing reasons, we conclude that the record contains insufficient evidence to support defendant's criminal conviction for trade secret theft.[12]

DISPOSITION
The judgment of conviction is reversed. The trial court is directed to dismiss the information and to order that any fine or restitution paid by defendant be remitted to him.
PREMO, Acting P.J., and BAMATTRE-MANOUKIAN, J., concur.
NOTES
[*] The Supreme Court ordered that the opinion be not officially published. (See California Rules of Court Rules 976 and 977.)
[1] All further statutory references are to the Penal Code unless otherwise specified.
[2] An IQ (interface/quadface) modulator produces a wave frequency, such as a microwave or a radio wave, which is used for testing communications devices. The IQ modulator for the 69000b was purchased from an outside vendor. Defendant's job was to design additional circuits for the IQ modulator, including microwave mixers, doublers, and filters. He also worked on the circuit layout drawings, and was expected to assist in integrating the modified IQ modulator into the 69000b Synthesizer. In the creation of a circuit, design precedes layout, and layout precedes fabrication of a prototype. Once the prototype tests successfully, the individual circuit is ready for integration with other components.
[3] Section 499c provides in pertinent part as follows: "(a)(9) `Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (A) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. [¶] (b) Every person is guilty of theft who, with intent to deprive or withhold the control of a trade secret from its owner, or with an intent to appropriate a trade secret to his or her own use or to the use of another, does any of the following: [¶] (1) Steals, takes, carries away, or uses without authorization, a trade secret. [¶] (2) Fraudulently appropriates any article representing a trade secret entrusted to him or her. [11] (3) Having unlawfully obtained access to the article, without authority makes or causes to be made a copy of any article representing a trade secret. [¶] (4) Having obtained access to the article through a relationship of trust and confidence, without authority and in breach of the obligations created by that relationship, makes or causes to be made, directly from and in the presence of the article, a copy of any article representing a trade secret."
[4] Significantly, the Penal Code and Civil Code definitions of "trade secret" are identical. (§ 499c, subd. (a)(9); Civ.Code, § 3426.1, subd. (d).) Civil Code sections 3426-3426.1 codify California's adoption of the Uniform Trade Secrets Act ("UTSA"). (See, Legis. Counsel's Dig., Assem. Bill No. 2191, Stats. 1996, ch. 121: "This bill would conform Penal Code definition of trade secret with that of the Uniform Trade Secrets Act.") For that reason, decisions interpreting the Civil Code definition of "trade secret" are relevant to our analysis here. We also observe that even cases predating California's adoption of UTSA are persuasive, since the Act codifies common law. (See Note, The Secret's Out: California's Adoption of the Uniform Trade Secrets Act Effects on the Employer-Employee Relationship (1987) 20 Loyola L.A. L.Rev. 1167, 1198, fn. 155, 1212, fn. 226, 1215, fn. 235.)
[5] The relevant portion of that book was admitted at trial as defendant's Exhibit F. To the extent that Exhibit F and defendant's testimony demonstrate that the information in the diagram may be freely obtained, they do not bear on the definitional issue. "[W]hether a fact is `readily ascertainable' is not part of the definition of a trade secret in California." (ABBA Rubber Co. v. Seaquist (1991) 235 Cal. App.3d 1, 21, 286 Cal.Rptr. 518. Accord, (Imax Corp. v. Cinema Technologies, Inc. (9th Cir.1998) 152 F.3d 1161, 1168, fn. 10.) However, "the assertion that a matter is readily ascertainable by proper means remains available as a defense to a claim of misappropriation." (Legis. Com. com., 12A West's Ann. Civ.Code (1997 ed.) § 3426.1, p. 239.) Accord, ABBA Rubber Co. v. Seaquist, supra, 235 Cal.App.3d at p. 21, fn. 9, 286 Cal.Rptr. 518; Imax Corp. v. Cinema Technologies, Inc., supra, 152 F.3d at p. 1168, fn. 10. See generally, Note, supra, 20 Loyola L.A. Law Rev. at pp. 1200-1201, 1213-1214.) "Information is readily ascertainable if it is available in trade journals, reference books, or published materials." (Legis. Com. com., 12A West's Ann. Civ.Code, supra, § 3426.1, p. 239.)
[6] Even accepting that the particular parameters were proprietary to Anritsu, it is not clear that trade secret protection follows, for "a valve manufacturer has no advantage over his competitor simply in having a unique configuration, a unique way in which he arranges and uses the commonly held or available knowledge, ideas and mechanical principles relating to the art." (Futurecraft Corp. v. Clary Corp., supra, 205 Cal.App.2d at p. 281, fn. 1, 23 Cal.Rptr. 198.)
[7] The prior version of 499c defined a trade secret as information that "gives one who uses it an advantage over competitors who do not know of or use the trade secret...." (Former § 499c, subd. (a)(9); see Stats. 1983, ch. 933, § 2, p. 3379. And see generally, Note, supra, 20 Loyola L.A. L.Rev. at p. 1200.) The statute was amended in 1996. (Stats. 1996, ch. 121, § 1.) The current version of section 499c applies here.
[8] In his closing argument at trial, the prosecutor argued that a competitor might be able to identify Anritsu's prospective customers from the information disclosed on Exhibit 2A. But there was no testimony to that effect at trial. Nor does the record contain any evidence from which such an inference could be drawn. (See, People v. Pribich, supra, 21 Cal. App.4th at p. 1851, 27 Cal.Rptr.2d 113.)
[9] For general security, Anritsu restricted access to its building by requiring employees to use key badges. In addition, the company required defendant (and, presumably, other employees) to sign an agreement governing proprietary inventions. But Anritsu's design files were not subjected to such strict measures. For example, defendant sometimes worked on them at home. And even at the workplace, defendant did design work at his own computer instead of the company's common workstation. Finally, there was no explicit company policy requiring engineers to retain or safeguard circuit design files, other than the constraints of good engineering practice.
[10] McMullen also testified that defendant expressed his belief that the layout drawings, not the designs, were important to the company, and that he had turned those drawings over to Anritsu's mechanical engineer before leaving the company. The relative importance of the layout drawings as compared to circuit designs was confirmed by a defense expert witness and was uncontradicted.
[11] We note, however, that defendant seemed confused in his testimony on this point, at least as to the time frame of the interview. The trial court also appeared to harbor some doubt as to whether defendant actually used the diagram, asking questions of counsel during argument about whether intent alone was a sufficient predicate for conviction.
[12] Our decision in this case is not intended to affect any civil proceedings that may be pending between defendant and Anritsu.